STATE of Missouri, Respondent,

v.

George J. PETERS, Appellant.

No. KCD 29710.

Missouri Court of Appeals, Western District.

April 30, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 11, 1979.

Application to Transfer Denied July 17, 1979.

J. Martin Kerr, Tittle & Kerr, A Professional Corporation, Independence, for appellant.

John D. Ashcroft, Atty. Gen., Frank J. Murphy, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., and DIXON and TURNAGE, JJ.

PER CURIAM.

Defendant George J. Peters was convicted by a Jackson County jury of murder in the first degree and was sentenced in accordance with the verdict to life imprisonment. He has appealed to this court, alleging that the trial court erred in denying his motion to quash the jury panel from which the jury was selected. The motion was based upon the alleged underrepresentation of women on the jury panel, in violation of his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States to be tried by a jury drawn from a panel representing a fair cross section of the community.

This point must be sustained.

In connection with the motion to quash the jury panel, it was stipulated by the state and the defendant that the panel was selected from a jury wheel which had been made up as follows:

Step 1. From the list of registered voters of Jackson County were selected at random a number of prospective jurors for the year 1976.[1] To these persons were sent questionnaires in the form prescribed by Section 497.130, RSMo 1975 Supp., to be completed and returned to the jury commissioner.

This questionnaire informed women of their exemption from jury service, if claimed. A woman could claim the exemption by signing her name on a line provided for the purpose and returning the questionnaire, otherwise uncompleted, to the jury commissioner. There were 29,144 questionnaires mailed to *women* who were eligible for jury service. Of that number, 21,884 (75%) were returned with the women's automatic exemption claimed.

Step 2. From the completed questionnaire, when returned, those persons were eliminated who were ineligible or who claimed exemption. The remaining names constituted the jury wheel for the one year. The 1976 jury wheel contained 19,755 males (70.9%) and 8,099 females (29.1%).

Women represented 54% of the general population, according to the 1970 census.

Step 3. From week to week there were summoned from the jury wheel, by random selection, the number of prospective jurors which a designated circuit judge determined to be needed for jury service the following week. These summonses contained on the back this instruction: "Women, if you do not wish to serve, return the summons to the judge named on the reverse side as quickly as possible."

Step 4. From the prospective jurors who responded to the summonses week by week the panels were made up from which the petit juries were selected.

The stipulation supplies the additional information that, during the months of January through July there were 4519 prospective jurors who actually appeared for service in response to the summonses. Of these, 3877 (85.8%) were men, while 642 (14.2%) were women. Of the thirty weekly groups appearing for service, women represented less than 15% of the number on each of sixteen. Their lowest ratio was 7.3% and their highest was 21.9%.

At defendant's trial, the jury was chosen from a panel of 60, including 13 women. The trial jury was made up of twelve men and no women.

On similar evidence, the Supreme Court of the United States in *Duren v. Missouri*, 439 U.S. ——, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), determined that Jackson County venire selection system resulted in an underrepresentation of women on venires, and that the defendant Duren was thereby deprived of his constitutional right to a jury drawn from a fair cross section of the community. Such right, said the Court, citing *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), is given by the Sixth and Fourteenth Amendments to the Constitution of the United States. The *Duren* case, decided during the pendency of the appeal in the instant case, is controlling here.

1. The statistics are for the year 1976 while defendant's trial occurred May 31–June 2, 1977. As we read the stipulation, it is agreed that the situation during the former period also obtained at the time of defendant's trial.

In *Duren*, the court stated that the defendant had established a prima facie violation of the fair-cross-section requirement by showing: first, that women were a numerous and distinctive group in the community; second, "that the representation of this group in venires from which juries are selected [was] not fair and reasonable in relation to the number of such persons in the community"; and, third, "that this underrepresentation [was] due to systematic exclusion of the group in the jury-selection process".

That the defendant in the case before us has established the first and second of these propositions requires no argument; the statistics make it plain enough. With respect to the third, the Supreme Court in *Duren* employed the following language in finding "systematic exclusion" in the Jackson County system:

> ". . . [Defendant's] undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized."

> ". . . The resulting disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the *system* by which the juries were selected. . . . [T]he underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria—whether the automatic exemption for women or other statutory exemptions—as implemented in Jackson County . . ."

This language is appropriate to the instant case, and we find that defendant here, as in *Duren*, has shown prima facie a systematic exclusion of women from venires.[2]

When defendant has made a prima facie case of fair-cross-section violation, it becomes the state's burden to justify the infringement by showing some "significant state interest" which overrides the fair-cross-section right. *Duren*, supra. The state failed to sustain that burden in *Duren*, and has failed to do so here.

*Duren* was handed down January 9, 1979. This case was tried May 31-June 3, 1977. *Duren*, however, is retroactive to the date of the decision in *Taylor v. Louisiana*, supra, which was handed down on January 21, 1975. *Duren* is applicable to any jury sworn after that date, if the defendant, as here, made a timely motion to quash the jury panel. *Lee v. Missouri*, 439 U.S. ——, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979).

Defendant's other assignments of error are based upon incidents which will not necessarily occur in another trial, and we see no need to deal with them.

The judgment is reversed and the cause is remanded for a new trial.

---

**2.** The Supreme Court of the United States in the *Duren* case considered statistics for the period of June-October, 1975, and January-March, 1976. The results were practically identical to those for the January-July, 1976, period.