*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CM-0020

KEVIN MICHAEL BROWN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2020-CMD-007728)

(Hon. Jason Park, Trial Judge)

(Argued April 09, 2025          Decided July 29, 2025)[*]

*Russell A. Bikoff*, for appellant.

*Thomas D. Hill*, with whom then-United States Attorney *Matthew M. Graves*, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Luke Albi*, *Michael Dal Lago*, and *Anne Y. Park*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

---

[*] The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment.  It is now being published upon the court's grant of the government's unopposed motion to publish.

BLACKBURNE-RIGSBY, *Chief Judge*: Following a jury trial, appellant Kevin Michael Brown was convicted of simple assault with a bias enhancement. Mr. Brown noted an appeal, arguing that the trial court's denial of his request for jury data to support his claim that the venire panel failed to reflect a fair cross-section of the community violated his statutory rights under the District of Columbia Jury Systems Act (DCJSA), D.C. Code § 11-1901, et. seq., and his constitutional rights under the Fifth and Sixth Amendments. He also contends that there was insufficient evidence to support his conviction for bias-related assault. We disagree and affirm the trial court's judgment.

## I.     Factual Background

At trial, the government presented the following evidence.

In October 2020, Christopher Reyes, his partner Manuel Cosme, and Mr. Reyes's 15-year-old nephew, Fabian, took the Metro to the Fort Totten station. They took the escalators to the Red Line platform and began taking selfies when a stranger approached them. The stranger asked Mr. Reyes if he was gay, and Mr. Reyes said "yes." The stranger then asked if the young man was Mr. Reyes's child, and Mr. Reyes again said "yes."

Mr. Reyes, Mr. Cosme, and Fabian attempted to walk away from the stranger when the stranger began questioning Fabian, asking him, "Do you like girls? Are these guys touching you?" The stranger repeated these questions several times, and despite Mr. Reyes's efforts to create distance, the stranger continued to follow and badger them. The stranger asked Fabian multiple times, "Do you want to come with me?" and stated, "I'll get you away from these faggots." The stranger then blocked Mr. Reyes and Fabian from taking the escalator to the platform. The stranger punched Mr. Reyes in the face and then said to an older woman, "These guys are fucking this little boy." Mr. Reyes responded, "We don't know what you're talking about." The stranger punched Mr. Reyes in the face again, causing him to drop his cell phone onto the train tracks.

Mr. Reyes, Mr. Cosme, and Fabian attempted to leave four more times. The stranger then struck Mr. Reyes for a third time on the right side of his face. Bystanders intervened to separate the stranger from Mr. Reyes, Fabian, and Mr. Cosme. Mr. Cosme took the escalator down to reach the station manager and to call 911. The stranger then got on a train and departed. The stranger was apprehended at the Brookland metro station and identified as Mr. Brown.

Mr. Brown was charged with four misdemeanors: one count of simple assault; one count of assault on a law enforcement officer; one count of resisting

arrest; and one count of destroying property. The government later moved to amend the charges to include a bias enhancement but eventually dropped all charges except the charge of simple assault with a bias enhancement.[1] At the end of the jury trial, the jury found Mr. Brown guilty of simple assault with a bias enhancement. He was sentenced to 270 days of incarceration, with credit for time served. He noted a timely appeal.

## II.    Discussion

### a.  Sufficiency of the evidence

Mr. Brown argues that his conviction should be reversed primarily because "there [was] no in-court identification made at all." First, he notes that Mr. Reyes and Mr. Cosme failed to recognize or identify him as the assailant during the trial. Second, he contends that Officer Dixon, the arresting officer, was not present at the scene of the crime, did not witness the assault, and made the arrest at a different metro station over five minutes after the assault occurred. Additionally, Mr. Brown argues that Officer Dixon's testimony where Officer Dixon identified Mr. Brown as

---

[1] A "[b]ias related crime" is defined as an "act that demonstrates an accused's prejudice based on the actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibility, homelessness, disability, matriculation, or political affiliation of a victim of the subject designated act." D.C. Code § 22-3701(1A).

the man arrested was insufficient to sustain the conviction, particularly since Officer Dixon left for medical treatment before searching, processing, or identifying the person that had been arrested. Lastly, he argues that Officer Dixon conceded the video surveillance from the Metro Station where the assault occurred was not clear enough to definitively link the person in the video as being Mr. Brown.

When considering a sufficiency of the evidence claim, the evidence is reviewed "in the light most favorable to the verdict, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Nelson-White v. United States*, 323 A.3d 459, 464 (D.C. 2024). Viewing the evidence in the light most favorable to the verdict, there was ample evidence from which a reasonable factfinder could conclude beyond a reasonable doubt that Mr. Brown was the person who assaulted Mr. Reyes on the Fort Totten Metro Station platform.

During the trial, the government offered the testimony of Officer Dixon who, at the time, had been an officer with the Metro Transit Police for eighteen years. Officer Dixon testified that he responded to a service call at the Brookland Metro Station. He testified that in response to the call, the individual who was arrested that day was "Kevin Brown" and he identified Mr. Brown in the courtroom as the

individual wearing a black shirt and brown vest. When explaining the call he received, Officer Dixon described it as a "radio run" about an "assault in progress" at the Fort Totten station. During the assault, the officers received a description of the assailant as a black male with locs ("dreadlocks"), wearing dark clothes, and blue jeans. Officer Dixon testified that he and his partner, Officer Pree, went to Brookland instead of Fort Totten, because the dispatcher told them that the "subject" boarded a Red Line train in the direction of Shady Grove and that operators would hold the train at the Brookland station, which was one stop away from Fort Totten. According to Officer Dixon, the dispatcher followed the suspect on camera, so Officer Dixon was getting information in real time about the person's movements at the Brookland Station. The officers knew Mr. Brown was coming up the escalator because the dispatcher informed them that he was. When the officers approached Mr. Brown at the Brookland Metro Station, they identified themselves and said that they wanted to talk to him. Officer Dixon took a few steps towards Mr. Brown, who began to run toward a grassy area and the wall separating the train tracks from the bus bay. The officers chased him and eventually arrested him.

Officer Dixon then narrated the events as he watched the video of himself and Officer Pree stopping Mr. Brown at the Brookland Metro Station. Officer Dixon laid the proper foundation for pictures of the Metro Station that were later admitted

into evidence. Officer Dixon testified that he twisted his knee while chasing the suspect, and as a result, Officer Pree was the person who apprehended the suspect.

On cross-examination, Officer Dixon testified that he did not search or book Mr. Brown and was not present to do so because he twisted his knee during this chase and was taken to the hospital. Officer Dixon testified that his knowledge of Mr. Brown's name came from his review of paperwork in preparation for trial. He testified that he remembered the person sitting next to the defense attorney as the suspect he chased but that "his beard wasn't as full as it is now." Officer Dixon conceded that he could not recognize Mr. Brown's face in the video surveillance tapes but that at the time he pursued Mr. Brown, he noticed that Mr. Brown was the only person fitting the description given.

Based on the surveillance footage of the assault and the contemporaneous information provided by the dispatcher, as described in Officer Dixon's testimony, a reasonable juror could conclude that the individual who assaulted Mr. Reyes at the Fort Totten Metro Station and the individual fleeing from officers at the Brookland Metro Station was Mr. Brown. Officer Dixon's identification of Mr. Brown as the person he chased, supported by the dispatcher's real-time updates, and the eventual arrest of Mr. Brown provided sufficient grounds for conviction. A reasonable juror

could find Officer Dixon's identification, along with a totality of the evidence presented, convincing beyond a reasonable doubt.

### b. Fair Cross-Section Claim

Mr. Brown also argues that the trial court erred when it (a) determined that counsel failed to make a prima facie showing of systematic discrimination in the jury venire panel based on race or ethnicity and (b) denied him access to the juror records in order to substantiate his claim that the jury venire did not represent a fair cross-section of the community. He requests that this case be remanded to the trial court to permit discovery pursuant to the DCJSA. We disagree with Mr. Brown and affirm the trial court's ruling for the reasons stated below.

The Sixth Amendment guarantees a criminal defendant the "right to be tried by an impartial jury drawn from sources reflecting a fair cross-section of the community." *Israel v. United States*, 109 A.3d 594, 602-03 (D.C. 2014). We review de novo, a denial of a claim alleging a violation of the right to be tried by an impartial jury drawn from sources reflecting a fair cross-section of the community. *Israel*, 109 A.3d at 602-603 (internal quotation marks omitted).

The DCJSA codifies this Sixth Amendment right and governs the selection of jurors in the Superior Court. *See* D.C. Code § 11-1901; *Gause v. United States,* 6 A.3d 1247, 1251-52 (D.C. 2010) (en banc) (hereinafter *Gause II*) (noting that the

DCJSA mandates a jury selection process that is free from unlawful discrimination and includes provisions for litigants who wish to challenge the composition of jury venires that violate the fair cross-section requirement). The DCJSA "provide[s] for the establishment of an independent jury system" for the Superior Court. *Gause II* at 1250. It further guarantees that "[a]ll litigants entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the residents of the District of Columbia." D.C. Code § 11-1901. The DCJSA requires that a motion challenging the jury venire must be brought and decided before any individual juror is examined. *Id.* § 11-1910(a). The trial court, however, is afforded discretion to modify the timeline. *Id.* Specifically, the DCJSA provides:

> A party may challenge the composition of a jury by a motion for appropriate relief. A challenge shall be brought and decided before any individual juror is examined, unless the Court orders otherwise. The motion shall be in writing, supported by affidavit, and shall specify the facts constituting the grounds for the challenge. If the Court so determines, the motion may be decided on the basis of the affidavits filed with the challenge. If the Court orders trial of the challenge, witnesses may be examined on oath by the Court and may be so examined by either party.

D.C. Code § 11-1910(a). The trial court is required to "stay the proceedings pending the selection of a jury in conformity with [the] chapter, quash the indictment, or grant other appropriate relief" if the trial court determines that there was substantial failure

to comply with the chapter during selection of a grand or petit jury. *Id.* § 11-1910(b). The DCJSA allows for the disclosure of relevant court records "in connection with the preparation or presentation of a motion under [Section] 11-1910." D.C. Code § 11-1914(b). The procedures in the DCJSA are "the exclusive means by which a person accused of a crime, the District of Columbia, the United States, or a party in a civil case may challenge a jury on the ground that the jury was not selected in conformity with [the] chapter." *Id.* § 11-1910(c).

In *Gause II,* where the request for the jury selection records was made pretrial, we made clear that there is no threshold showing required before jury selection records can be obtained. *See Gause,* 6 A.3d at 1256. We also emphasized that obtaining access to jury selection records upon request is an essential part of preparing to file a fair cross-section claim. *Gause II* at 1253. Such records are critical to identifying and substantiating a fair cross-section claim because a litigant that cannot access these records would be left to speculate about the composition of the venire. *Id.* at 1256 (stating that records are important in proving a discrimination claim and even a modest threshold requirement may prevent parties from discovering whether they have a meritorious challenge). However, such a request for records must be timely in order to meet the DCJSA's requirement that a written motion be brought and filed prior to individual voir dire. D.C. Code § 11-1910(a).

Mr. Brown's initial fair cross-section objection, noting that only three of the fifty-four people in the jury venire were African American, was made orally prior to any individual juror being examined when the jury venire was first brought into the courtroom. The trial judge expressed skepticism about counsel's motion and, in accordance with D.C. Code § 11-1910(a), permissibly exercised his discretion and directed counsel to refrain from raising any further arguments related to the fair cross-section claim until after jury selection concluded. The trial court and Mr. Brown's counsel had the following exchange:

> THE COURT: Parties, if I could have you on the headsets, and then we'll begin the individual voir dire. . . .
>
> MR. BURRELL: Defense is going to have to raise the issue of it -- this not being a fair cross section of the -- the African American community. This is probably one of the most underrepresented panels I've seen. I count a total of three African Americans. That's about 5 percent of 54. African American population in D.C. is upwards of –
>
> THE COURT: Okay.
>
> MR. BURRELL: – 40, 45 percent. I don't think this is a reasonable and fair cross section.
>
> THE COURT: Okay. So there's obviously the second element of that, which requires a showing that the lack of -- that the disparity is the result of some sort of policy on -- on the Court. There's been no showing about that. But we can make that -- you can make that argument and any other argument you have after the jury selection is concluded. All right? Thank you.

The court then completed jury selection. After fourteen jurors were seated in the box but before the parties made preemptory strikes, Mr. Brown renewed his objection. Mr. Brown's counsel conceded that he did not have documentation to show how the jury selection process was conducted, and he then moved to strike the panel. The trial court denied the request and the conversation was as follows:

> THE COURT: All right. Any issues, defense?
>
> MR. BURRELL: Only about the objection we already raised concerning [] the cross section.
>
> THE COURT: Okay. Why don't you go ahead and make your record on that now before I excuse the rest of the jurors –
>
> MR. BURRELL: Yes, sir.
>
> THE COURT: – if you'd like. Go ahead.
>
> MR. BURRELL: So when the jury panel was brought in, I looked around the room. I noticed a total of three African Americans out of [fifty-four]. I think that that is a number that substantially underrepresents the African American community inside of D.C. I have no documentation of how the -- the jury selection process was conducted concerning getting a fair and reasonable representation. But I think what the – the numbers that were present considering the -- the number, [fifty-four] jury panel numbers, I don't think that that's a fair and reasonable cross section.
>
> THE COURT: All right.
>
> MR. BURRELL: And without –

THE COURT: Go ahead.

MR. BURRELL: Without being able to either, A, look at the process of how the – the jury was selected from the community, defense would object to the jury and move to strike the jury panel.

THE COURT: Government.

MR. DAL LAGO: Your Honor, at this time, the Government's not prepared to respond as we were lacking the same information the defense counsel was lacking.

THE COURT: No. So in order to establish a prima facie violation of the fair cross section requirement, the defendant must show that the group alleged to be excluded is a distinctive group in the community, that the representation of this group in [the venire] from which juries are selected is not fair and reasonable in relation to the number of such persons in the community and, number three, that this underrepresentation is due [to] systematic exclusion of the group from the jury selection process. Even accepting Mr. Burrell's numbers, which seem roughly accurate, there were some folks for whom it was not clear to me who we did not speak to what their -- what their race was. Even assuming that we are at under [ten] percent of the [venire] having been African American, the fact is that the defense has made no showing that this underrepresentation is due to any systematic exclusion of the group from the jury selection process. There's no showing of that at all. And so, for those reasons, I will deny the motion. [2]

And is there any additional -- so that's preserved for the record. Is there any additional issue, Mr. Burrell?

---

[2] Although Mr. Brown asked the court to strike the jury venire, Mr. Brown does not appeal the trial court's denial of the motion to strike.

This colloquy demonstrates that the court made a permissible ruling in denying the motion because the defense failed to present the necessary evidence of systematic exclusion required to succeed in a fair cross-section challenge. After the court denied the motion to strike the venire, counsel asked to obtain "appropriate records" so that he could review them overnight in preparation to make his arguments the next day. We interpret counsel's request as a request for additional time to gather the records to make a motion pursuant to the DCJSA, a motion which the trial court already denied for failure to make a prima facia showing of systematic discrimination. The court denied this request and the exchange was as follows:

> MR. BURRELL: That defense would have to look at how the jury selection process was conducted in order for me to get adequate information and see if there was a systematic exclusion. I don't have access to that right now, so that would be the only way I could possibly make that argument is if I get to look into the jury selection records and see, make a determination, if there was any systematic exclusion. So we request that the defense would be—for the defense to—to get the appropriate records so I can review them overnight and make my argument for tomorrow.
>
> THE COURT: So there is, in fact, cross-section litigation that is happening in this courthouse that is being initiated by the Public Defender Service. It doesn't appear that this defendant has joined in that litigation, so that request is denied.
>
> And so, Mr. Burrell, if – I'm not sure what else to tell you at this juncture other than that there are certain requirements under the law that the defendant must wake

-- must make. There are efforts that are being made by some defendants in other cases in order to get at these issues. This case has proceeded to trial without those efforts having been undertaken, and—and I have no—and so there is no prima facie showing of a systematic exclusion based on some sort of policy within the Superior Court of excluding one group or another. So on this record, I will deny the request at this juncture. All right? Thank you.

MR. BURRELL: Yes, Your Honor.

The trial court, in its discretion, was within its rights to consider whether such a late request for discovery should be granted. Counsel did not provide a specific reason for his untimely request for documents, other than his claim that only upon first seeing the venire for this particular trial, was he alerted that it was racially disproportionate. However, given that a venire is a small sample size, it is not surprising that any given venire could be disproportionate with respect to one or more protected classes. This does not necessarily imply that the selection process itself was flawed. After the jury exited the courtroom, the judge returned to the fair cross-section issue.

THE COURT: Just to finish out my findings, with respect to Mr. Burrell's challenge, I understand that, the challenging circumstance that you are in, but based on my review of the case law and the information that's in front of me, there is nothing on the record to indicate that these jurors were selected in any way that is different from any other panel members who are selected in the D.C. Superior Court. There is no record in front of me that—anything about the timing of this trial or about any other procedures

> that the Court employed disproportionately impacted one racial group, one ethnic group, one gender, or any other –
>
> . . .
>
> THE COURT: All right.  So as I was saying that there's no indication that there was any policy or procedure that was employed by this Court that resulted in a systematic exclusion or underrepresentation of any particular group.  And so for those reasons, I have denied that motion.  It's preserved for the record.  All right?

The request for records appears to have been denied because it was untimely, as it was made only after Mr. Brown's oral motion pursuant to the DCJSA was denied.  As is clear from the transcript, counsel made the request to obtain the jury selection records only after the court denied the oral motion to strike, a motion that counsel acknowledged was made without any prior requests for information or records concerning the selection process.  Here, it was clearly within the court's discretion to reject a discovery motion only brought after the substantive motion to strike had already been denied.

We also disagree with Mr. Brown and do not interpret the trial court's ruling as imposing a prima facie showing before granting a litigant's request for jury selection records under the DCJSA.  As noted previously, our ruling in *Gause II* prevents a trial court from imposing a prima facie showing before granting a

litigant's request for jury selection records.[3] *See Gause II,* 6 A.3d at 1253. While the trial court summarized the factors for establishing a prima facie violation of the fair cross-section requirement as outlined in *Duren* [4] when explaining its denial of the requests for records, it did so after denying Mr. Brown's motion to strike based on the fair cross-section issue. In our view, the trial court treated the request for records as a motion to reconsider its prior ruling on Mr. Brown's motion to strike.

---

[3] We made clear that there is no threshold showing required before jury selection records can be obtained. *Gause,* 6 A.3d at 1253. We stated that "nothing in the language of the DCJSA requires litigants to demonstrate a threshold showing of need or justification before they may inspect certain nonpublic records that are relevant for the 'preparation or presentation of a motion' alleging 'substantial failure to comply with'" the DCJSA. *Id.* We further explained that "[o]n its face, . . . the DCJSA reveals no intent to condition the right of inspection upon a litigant's possession and proffer of facts independently tending to show improper jury selection—facts that almost invariably would be unavailable to one considering a potentially meritorious jury challenge." *Id.* (citing *Test v. United States*, 420 U.S. 28, 30 (1975)) (internal citations omitted). We noted that imposing a threshold showing requirement would qualify the right and would not support the DCJSA's purpose "of ensuring that litigants have access to discovery for purposes of preparing a motion challenging the jury selection process," which in turn ensures that "grand and petit juries [are] selected at random from a fair cross section of the community." *Id.* at 1255-56 (brackets in original).

[4] To show a violation of the fair cross-section requirement, a litigant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Israel*, 109 A.3d at 603 (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

In denying the belated request for discovery, it was not unreasonable for the trial court to repeat the rationale behind denying the initial unsupported motion to strike.

Accordingly, we hold that the court did not err in denying Mr. Brown's motion to strike the panel but rather exercised its discretion in denying Mr. Brown's unsupported oral motion that the panel did not represent a fair cross-section of the community. We also hold that the court did not impose a threshold requirement in denying the request for records, but rather, denied the request as untimely.

### III.   Conclusion

For these reasons, we affirm the trial court's ruling.

*So ordered.*