**Robert E. SMITH, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 71A04–9505–CR–195.

Court of Appeals of Indiana.

Nov. 29, 1995.

Transfer Denied Jan. 24, 1996.

John Pinnow, Special Assistant to the State Public Defender, Greenwood, for Appellant.

Pamela Carter, Attorney General, Jodi Kathryn Rowe, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Defendant–Appellant Robert E. Smith (Smith) appeals from his convictions for attempted murder, a Class A felony[1]; and three counts of criminal recklessness as Class D felonies[2].

We affirm.

### ISSUES

The following re-stated issues are presented for our review:

1. Whether Smith's rights were violated due to the manner in which the jury venire was selected.

2. Whether there was sufficient evidence of Smith's intent to kill to support his conviction for attempted murder.

3. Whether Smith's 53 year sentence was manifestly unreasonable or amounted to vindictive justice.

### FACTS AND PROCEDURAL HISTORY

At approximately 10:00 p.m. on May 1, 1992, South Bend Police Officers Mitchell Kajzer and Michael Suth were patrolling the southwest side of South Bend near LaSalle Park. While on routine patrol, the officers observed a yellow 1969 Buick Electra convertible turn erratically onto Washington Street from Falcon Street and proceed eastbound on Washington Street. Due to the erratic driving, the officers executed a traffic stop of the vehicle. Bridget Rzepka was driving the vehicle and Delano Murray was her passenger.

Nearby at the intersection of Washington and Falcon, several people were congregating, including Smith, Billy Hendricks, Ernest Taylor, Ricardo Phillips and Charles Taylor. The group saw and heard the yellow convertible squealing around the corner, and then observed the traffic stop of the convertible. At about this time, Smith and Billy Hendricks walked across the street toward Lake Street. Smith had a .9 mm handgun in his possession.

After advising dispatch of the traffic stop, Officers Kajzer and Suth approached the yellow convertible, which had stopped in front of 113 South Lake Street. While the officers were approaching the vehicle and obtaining registration and identification, another car pulled up a few car lengths away from the convertible. Taraious Ford, who knew Bridget and Delano, and his passenger, exited the car and approached the scene of the traffic stop. At about this time, the sound of gunfire exploded in the bushes at the northeast corner of 113 South Lake Street, to the right of where Officer Kajzer was standing. The first shot hit Officer Kajzer in the left ankle and he fell to the ground. The gunfire continued and Officer Kajzer was again struck by bullets in his right calf, left hip, and right buttock. As Officer Kajzer crawled on the ground seeking safety, several shots struck the dirt and grass near his body. Both Officer Kajzer and Suth returned fire toward the bushes and backup help was summoned. Delano and Bridget remained in the convertible during the shooting. One shot hit the passenger door of the convertible and another hit and made a hole in the ragtop.

A short time later, Ernest Taylor saw Smith and Billy Hendricks running toward Ernest's car. Ernest drove Billy and Smith to his house. Charles Taylor and Ricardo Phillips also left and went to Ernest's house. There, the five saw a news flash about the shooting, which reported that a police officer had been shot. Hendricks and Ernest Taylor testified that Smith said he thought he had shot a police officer. All of the men agreed not to tell the police that they were in the area at the time of the shooting.

Following a police investigation, in the early morning hours of May 2, 1992, the police picked up Hendricks, the Taylor brothers, Floyd Cunningham and Smith, and took

---

1. IND.CODE 35–41–5–1 (1993); I.C. 35–42–1–1 (1993).

2. I.C. 35–42–2–2 (1993).

them to the South Bend Police Department for questioning. Following the questioning, the men were released. Smith was arrested the following day. Hendricks and the Taylor brothers were charged with assisting a criminal.

On May 4, 1992, Smith was charged by information with one count of attempted murder and three counts of criminal recklessness. Following a two day trial by jury, he was found guilty as charged. Smith was sentenced to 50 years incarceration on the attempted murder count and 3–three year terms for each of the criminal recklessness counts. The criminal recklessness sentences are to be served concurrently to each other, but consecutive to the attempted murder term. Thus, Smith received an aggregate sentence of 53 years. Smith appeals from his conviction and sentence. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I.  Challenges to the Jury Venire

Smith is an African–American man. He was convicted for the attempted murder of the victim Mitchell Kajzer, a Caucasian. Smith was tried by an all white jury. Smith contends that he was denied equal protection of the law and due process of the law due to the manner in which the jury venire was selected. Specifically, he argues that the exclusive use of voter registration lists as the source of the jury pool resulted in the under-representation of African–American jurors. Smith also argues that the bailiff's use of the telephone to contact potential jurors resulted in the under-representation of African–American jurors.

On December 8, 1992, the jury administrator for the St. Joseph Superior Court provided Judge Jeanne Jourdan's bailiff a list of 100 prospective jurors. The list was generated by a computer database containing names of registered voters in St. Joseph County who had completed and returned questionnaires mailed to them months earlier. The procedure used to select Smith's jury pool was the same procedure used in every jury selection for St. Joseph County.

After obtaining the list of 100 prospective jurors, the bailiff began telephoning the people on the list. The first 55 people reached by telephone were told to report to jury duty on December 15, 1992. Those individuals listed who did not have telephone numbers or whose telephone numbers listed on the printout were no longer correct, were not called. Such individuals are not contacted by other means unless the printed list is exhausted during jury selection. The procedure used to contact potential jurors was the same procedure used in every jury selection process in St. Joseph County.

On the first morning of trial, 49 of the 55 prospective jurors reported for jury duty. One out of those 49 prospective jurors was African–American. Prior to *voir dire*, Smith moved to strike the pool, citing *Batson*[3] in support of his motion. Smith argued that the jury pool did not represent a fair cross-section of the community. The trial court denied Smith's motion to strike the panel. Later during *voir dire*, after the African–American potential juror was struck for cause[4], Smith renewed his objection. Again, the trial court denied the motion.

On February 16, 1993, Smith filed a motion to correct errors alleging that he was denied both equal protection of the law and due process of the law due to the manner in which the prospective jurors were selected and contacted. The trial court held extensive evidentiary hearings on the motion on

---

3. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1984).

4. The juror was struck for cause after all parties agreed that he should be challenged for cause due to his responses to the pre-trial publicity questioning. When asked to reveal the source of his prior knowledge of the case, when the information was learned and whether he remained open-minded, the juror responded as follows:

Well, I also have heard too much about it. We had a lot of discussions about it. I think I know someone that knows him so we discussed it too much and I heard too much about it on television and in the paper. So I probably am partial....
(R. 214).
When asked by the judge whether he had an open mind, he responded: "We talked so much about it, I heard so much about it, I don't think so." (R. 214).

two separate dates, and subsequently denied the motion.

■ I.C. 33–4–5–2 (1993) establishes the method by which jury venires are selected in Indiana.[5] The primary goal of jury selection procedures is to assure that a diverse group of citizens or a fair cross-representation of the community is chosen to sit on a jury. *State ex rel. Brune v. Vanderburgh Circuit Court* (1971), 255 Ind. 505, 265 N.E.2d 524. Minor irregularities in compliance with jury selection statutes do not constitute reversible error. *See Day v. State* (1994), Ind.App., 643 N.E.2d 1, 3, *trans. denied; Williams v. State* (1990), Ind., 555 N.E.2d 133, 138; *Terry v. State* (1992), Ind.App., 602 N.E.2d 535, 545; *Owen v. State* (1979), 272 Ind. 122, 125, 396 N.E.2d 376, 379. Substantial compliance with the statutory requirements is sufficient so long as the selection system used is impartial and not arbitrary. *Bradley v. State* (1995), Ind., 649 N.E.2d 100, 103.

### A. Equal Protection under The Fourteenth Amendment

■ Smith first argues that he was denied equal protection of the law due to the manner in which the master list of prospective jurors was compiled using exclusively the St. Joseph's County voter registration list.

Smith maintains that he made a *prima facie* case of purposeful discrimination in violation of the Equal Protection Clause.

■ To succeed under the Equal Protection Clause of the Fourteenth Amendment, Smith must show purposeful discrimination. *See Batson v. Kentucky* (1986), 476 U.S. 79, 88, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69, *modified by Powers v. Ohio* (1991), 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411; *Smith v. State* (1993), Ind., 609 N.E.2d 1088, 1090; *Harvey v. State* (1993), Ind.App., 621 N.E.2d 362; *Concepcion v. State* (1991), Ind., 567 N.E.2d 784, 788. Smith is laboring under the heavy burden of making a *prima facie* case of invidious purposeful discrimination. *See Alexander v. Louisiana* (1972), 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536.

At the motion to correct errors hearing, Smith presented census data indicating that 8.8% of the households in St. Joseph County were African–American. He argued that African–Americans are a distinctive group in the community, and were not fairly represented in the jury venire. However, as the trial court pointed out in its denial of Smith's motion, the voter registration list does not indicate race of the registered voter and the computer program used in St. Joseph County selects random names and does not reflect

5. I.C. 33–4–5–2(a) provides in pertinent part as follows:

The [jury] commissioners shall immediately, from the names of legal voters and citizens of the United States on the latest tax duplicate and the tax schedules of the county, examine for the purpose of determining sex, age, and identity of prospective jurors, and proceed to select and deposit, in a box furnished by the clerk for that purpose, the names, written on separate slips of paper of uniform shape, size, and color, of twice as many persons as will be required by law for grand and petit jurors in the courts of the county, for all the terms of such courts, to commence with the calendar year next ensuing.

I.C. 33–4–5–2(c) provides as follows:

Subject to appropriations made by the county fiscal body, the jury commissioners may utilize a computerized jury selection system. However, the system utilized for the selection system must be fair and may not violate the rights of persons with respect to the impartial and random selection of prospective jurors. The jurors selected under the computerized jury selection system must be eligible for selection

under this chapter. The commissioners shall deliver the names of the individuals selected to the clerk of the circuit court. The commissioners shall observe their oath in all activities taken under this subsection.

I.C. 33–4–5–2(d) and (e) provide as follows:

(d) The jury commissioners may supplement voter registration lists and tax schedules under subsection (a) with names from lists of persons residing in the county that the jury commissioners may designate as necessary to obtain a cross section of the population of each county commissioner's district. The lists designated by the jury commissioners under this subsection must be used for the selection of jurors throughout the entire county.

(e) The supplemental sources designated under subsection (d) may consist of such lists as those of utility customers, persons filing income tax returns, motor vehicle registrations, city directories, telephone directories, and driver's licenses. These supplemental lists may not be substituted for the voter registration list. The jury commissioners may not draw more names from supplemental sources than are drawn from the voter registration lists and tax schedules.

race at all. Smith further argued that the jury pool could have been broadened by using other sources. While I.C. 33–4–5–2(d) permits the use of sources other than the list of registered voters, this is only when the procedure as outlined in I.C. 33–4–5–2(a) fails to provide a fair representation of the community. The computerized jury selection system used in St. Joseph County is expressly permitted by I.C. 33–4–5–2(c), and we find no purposeful discrimination with regard to its use. In fact, even if the jury commissioner was of the mind to discriminate on the basis of race, the information necessary to do so would not be available. *Cf. Alexander*, 405 U.S. 625, 92 S.Ct. 1221 (appellant's conviction reversed due to purposeful, invidious discrimination in the impaneling of the grand jury which indicted him). The supplemental sources provided for under subsection (d) are simply options, and our supreme court has refused to treat section (d) as a mandate. *See Bradley*, 649 N.E.2d at 103–04 ("[a]bsent constitutional infirmity ... we decline to construe the statute so as [to] convert an option into a mandate.").

Furthermore, the Indiana Supreme Court recently affirmed the use of an automated computer system that randomly selects potential jurors using only the voter registration list. *Bradley*, 649 N.E.2d 100. To be sure, a narrow reading of I.C. 33–4–5–2 requires that both voter registration lists and property tax schedules be used in the selection of jury venires. However, in *Bradley*, after examining precedent, including the court's 1971 decision in *Brune v. Vanderburgh Circuit Court*,[6] the court concluded that "the computerized selection of potential jurors from voter registration lists alone, without the additional use of tax lists, is adequate to satisfy the statutory requirements." *Bradley*, 649 N.E.2d at 103.

We find no Fourteenth Amendment violation.

### B. Fair Cross–Section under The Sixth Amendment

▆ The basic distinction between the Equal Protection argument under the Fourteenth Amendment and the Fair Cross–Section argument under the Sixth Amendment is that the Equal Protection argument can be used to challenge all stages of jury selection: the development of the master list which the jury commissioner develops, the jury venire, and the ultimate 12 person jury panel. The Fair Cross–Section argument cannot be used to challenge the ultimate 12 person jury panel. The other fundamental difference between the two arguments is that under the Equal Protection argument, purposeful discrimination must be proven. Whereas under the Sixth Amendment, the challenger need only prove systematic discrimination. Systematic discrimination does not mean intentional discrimination, but rather, discrimination that is "inherent in the particular jury-selection process utilized." *Duren v. Missouri* (1979), 439 U.S. 357, 368 n. 26, 99 S.Ct. 664, 670 n. 26, 58 L.Ed.2d 579, 589 n. 26; *see also Bradley*, 649 N.E.2d at 104, n. 4.

▆ Under the Sixth Amendment Fair Cross–Section analysis, the defendant has the burden of proving systematic discrimination, or discrimination that is inherent in the process. *See Duren*, 439 U.S. 357, 99 S.Ct. 664. In order to establish a *prima facie* violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in jury pools from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this

---

**6.** 255 Ind. 505, 265 N.E.2d 524 (Because change in property tax assessment resulted in the exclusion of automobile owners from tax lists, the supreme court approved the use of a voter registration list for the selection of prospective jurors. More than a decade later in *Smith v. State* (1985), Ind., 475 N.E.2d 1139, *reh'g denied, post-conviction relief granted* (1989), Ind., 547 N.E.2d 817, the court reiterated that

[t]here must be a practical method of choosing prospective jurors. The use of lists, whether

they be property taxpayers or registered voters, so long as they represent a reasonable cross section of the people in the county, cannot be said to violate the rights of the accused, in the absence of showing that such use is made in a deliberate attempt to exclude certain groups from jury selection.

*Id.* at 1143 (quoting *Lloyd v. State* (1983), Ind., 448 N.E.2d 1062.

under-representation is due to systematic exclusion of the group in the jury-selection process. *Id.* at 364, 99 S.Ct. at 668–69. Once the *prima facie* case has been established, the burden shifts to the State to advance a significant state interest for which the process is utilized. *Id.* at 367–68, 99 S.Ct. at 670–71.

■ Smith has not demonstrated that the voter registration list does not represent a reasonable cross-section of the citizens of St. Joseph County or that the use of the voter registration list resulted in the exclusion of African–Americans as potential jurors. The fact that only one of the potential jurors in Smith's jury venire was African–American was pure coincidence. Further, the fact that the only African–American potential juror was struck for cause was due to his exposure to pre-trial publicity. The potential juror's removal for cause was agreed to by all parties, including Smith.

■ Based on the foregoing, Smith was not denied equal protection of the laws under the Fourteenth Amendment, nor was he denied a fair and impartial jury under the Sixth Amendment. As our supreme court reiterated in *Bradley,*

> [w]hile petit juries must be drawn from a source 'fairly representative of the community,' there is no requirement that they 'actually ... mirror the community and reflect the various distinctive groups in the population.' Defendants 'are not entitled to a jury of any particular composition,' but venire selection systems 'must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.'

*Bradley,* 649 N.E.2d at 104 (citing *Taylor v. Louisiana* (1975), 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690.

Smith's allegation that the telephone contact method by which the bailiff contacted potential jurors resulted in the exclusion of African–American potential jurors is similarly without merit. The record is void of any indication of purposeful exclusion of African–Americans from the jury selection process.

## II.  Sufficiency of The Evidence

■ Smith next contends that the evidence was insufficient to support his conviction for attempted murder. Smith particularly takes issue with the State's proof of the intent element of attempted murder.

■ When reviewing the sufficiency of the evidence, we will neither reweigh the evidence nor judge the credibility of the witnesses. We consider only the evidence most favorable to the verdict, and all reasonable inferences drawn therefrom. Where the evidence is in conflict, we are bound to view only that evidence which is most favorable to the trial court's judgment. If there is substantial evidence to support the verdict beyond a reasonable doubt, we must affirm. *Vickers v. State* (1995), Ind.App., 653 N.E.2d 110, 113.

The crime of attempt is statutorily defined as follows:

> A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same class as the crime attempted. However, an attempt to commit murder is a Class A felony.

I.C. 35–41–5–1(a). The crime of murder is statutorily defined as follows:

> A person who ... knowingly or intentionally kills another human being ... commits murder, a felony.

I.C. 35–42–1–1(1). Smith was charged with the attempted murder of Officer Kajzer as follows:

> On or about the 1st day of May, 1992, in St. Joseph County, State of Indiana, Robert E. Smith did knowingly attempt to commit the crime of murder by shooting Mitchell Kajzer with a gun thereby inflicting gunshot wounds to the body of Mitchell Kajzer, all with the intent to kill Mitchell Kajzer and which conduct constituted a substantial step toward the commission of

the crime of murder, that is: knowingly killing another human being.

(R. 9).

■ Smith argues that because none of the shots hit above Officer Kajzer's waist, the State failed to prove that he intended to kill Officer Kajzer. To convict a defendant of attempted murder, the jury must find that the defendant acted with the specific intent to kill when he took the substantial step towards committing the crime. *Beasley v. State* (1994), Ind., 643 N.E.2d 346, 348. A jury may infer intent to kill from the deliberate act of using a deadly weapon against another in a manner likely to cause death or serious injury. *Cate v. State* (1994), 644 N.E.2d 546, 548.

The evidence most favorable to the verdict reveals that while Officers Suth and Kajzer were involved in a routine traffic stop in which Smith was not involved, Smith approached the scene, hid in some nearby bushes and began firing shots from his .9mm automatic or semi-automatic pistol in the officers' direction. Officer Kajzer was shot in his ankle, and immediately fell to the ground. While on the ground, Officer Kajzer was shot three more times. He sustained serious and life-threatening injuries as a result of the shooting. After the shooting, Smith confided in his friends that he had shot a police officer. Firing the shots toward Officer Kajzer sufficiently exhibited Smith's intent to kill. *See Jones v. State* (1989), Ind., 536 N.E.2d 267, 270, *reh'g denied* (The jury could have properly inferred the defendant's intent to kill when he fired a gun in the direction of the police officer).

This evidence is sufficient to support Smith's conviction of attempted murder. *See McKinney v. State* (1995), Ind.App., 653 N.E.2d 115, 117 (If there is substantial evidence supporting the judgment beyond a reasonable doubt, we must affirm).

### III. Reasonableness of Sentence

■ Smith contends that his aggregate 53 year sentence is manifestly unreasonable and amounts to vindictive justice. Following a sentencing hearing, Smith was sentenced to a 50–year prison term for his attempted murder conviction and 3–three year prison terms for each of his criminal recklessness convictions. The criminal recklessness terms were to be served concurrent with each other but consecutive to the attempted murder sentence.

■ Sentencing decisions rest within the sound discretion of the trial court and we will reverse only upon a showing of a manifest abuse of that discretion. *Sims v. State* (1992), Ind., 585 N.E.2d 271, 272. A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which it was imposed. *Holmes v. State* (1994), Ind., 642 N.E.2d 970, 973.

■ After reviewing the transcript of Smith's sentencing hearing, we conclude that the trial court complied fully with I.C. 35–38–1–3 (1993), in that the court conducted a hearing, included the transcript of that hearing and a copy of the presentence report in the record and a statement of its reasons for imposing the sentence that it did, including a long recitation of aggravating circumstances. The court properly articulated the statutory aggravating factors upon which it relied to enhance Smith's sentences as follows: (1) Smith's history of delinquency; (2) the nature of the crime indicates the need for correction and rehabilitation that can best be served in a custodial situation; and (3) a reduced sentence would depreciate the seriousness of the crime. *See Howard v. State* (1993), Ind.App., 626 N.E.2d 574, 576–77, *trans. denied* (when the trial court exercises its discretion to enhance a presumptive sentence, the record must identify the relevant factors underlying its decision).

Under the sentencing guidelines in effect at the time of Smith's January, 1993, hearing, he received the maximum aggravated sentence for a Class A felony, 50 years [7]; and the maximum aggravated sentence for each

---

7. I.C. 35–50–2–4 (1993) provides in pertinent part as follows:
A person who commits a Class A felony shall be imprisoned for a fixed term of thirty (30) years, with not more than twenty (20) years added for aggravating circumstances....

of his Class D felony convictions, three years each.[8] While the court considered Smith's youthful age and the fact that he had recently fathered a child, the court chose not to treat these circumstances as mitigating.

Given the violent nature of the offenses and the weight assigned to the aggravating circumstances by the trial court, we do not find it probable that reasonable people would dispute Smith's sentence.

Smith also argues that a 53 year sentence in his case amounts to vindictive justice in violation of Article I, sec. 18 of the Indiana Constitution. As discussed above, the trial court's sentences, albeit aggravated, are expressly permitted by statute. Smith's sentences are not unreasonable and not violative of the Indiana Constitution. *See Holmes,* 642 N.E.2d at 973.

## CONCLUSION

Based on the foregoing, the manner in which St. Joseph County selects jury venires and contacts potential jurors does not violate the Fourteenth Amendment Equal Protection Clause or the Sixth Amendment Fair Cross–Section requirement; the State presented sufficient evidence to support Smith's conviction beyond a reasonable doubt; and Smith's 53 year sentence is not manifestly unreasonable, nor is it violative of the Indiana Constitution.

Accordingly, Smith's conviction and sentence is affirmed in all respects.

CHEZEM, J., concurs.

SHARPNACK, C.J., concurs except as to III on which he concurs in result.

8. I.C. 35–50–2–7 (1993) provides in pertinent part as follows:

A person who commits a Class D felony shall be imprisoned for a fixed term of one and one-half (1½) years, with not more than one and one-half (1½) years added for aggravating circumstances. . . .