Melinda MILLER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45A04–9708–CR–325.

Court of Appeals of Indiana.

May 4, 1998.

Transfer Denied July 8, 1998.

Mark A. Bates, Appellate Public Defender, Crown Point, for appellant-defendant.

Jeffrey A. Modisett, Attorney General, Carol A. Nemeth, Deputy Attorney General, Indianapolis, for appellee-plaintiff.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Melinda Miller appeals her conviction by jury of murder. We affirm.

### ISSUES

1. Whether the trial court committed reversible error by denying Miller's motion for a mistrial.

2. Whether the trial court erred in refusing to give Miller's tendered instructions on involuntary manslaughter and reckless homicide.

3. Whether sufficient evidence supports the conviction.

### FACTS

In the early morning hours of July 12, 1996, Rosalinda Ford, Keysha McFarland, and Richard Sager traveled from Hobart to 3637 Delaware Street in Gary to pick up Ford's friend, Kenny Washington. Washington's residence at that address was a reputed crack house. Ford entered the house, and her friends remained in the car at the curb. After waiting 20 or 30 minutes, they left and returned to Hobart. When Ford realized they had left her, she called them there and asked them to return for her; they agreed.

Ford went out of the house to wait for her ride. She walked up the street in one direction and then back toward Washington's house. She saw a white car pull up to the curb. Nancy George drove the car, and Vicki Hill was the passenger. Hill got out and began talking with a man named Eric and a woman called Star. Eric and Hill were yelling at each other. Eric "called [Hill] a white bitch and told her to go back in her hot little white car to her hot little white house and get her hot pink pussy out of the neighborhood." (R. 358). Washington told Eric to leave Hill alone, and Hill and Washington moved away, arguing. A man called Chicago told Star to leave Hill alone, and Star walked away.

George repeatedly told Hill to "get back in" and tried "to get her to leave." (R. 359). Now that Washington was engaged with Eric, and Star had left, Melinda Miller appeared and began "yelling and screaming" at Hill "to get her white honky ass out of there, that she was going to shoot her." (R. 170). Miller was waving a gun. Miller was standing within a few feet of Hill, who stood just outside the open passenger door. Ford heard five gunshots and saw an "orange flash" come from the gun Miller was pointing down toward Hill's feet. (R. 174). As Hill was turning and moving to get inside the car, Miller—from a distance of "arm's length or ... a couple feet"—raised the gun and shot toward Hill's upper body. (R. 179). Hill "went limp" and fell into the car. (R. 175). Ford saw blood come from Hill's mouth. George drove the car away. Miller walked

around waving the gun and saying, "I'm not going to jail." (R. 176).

Hill died of a gunshot wound. The bullet entered the right side of her upper back, went through her spine and lung, into her trachea, and out her mouth. Miller was charged with murder. A jury found her guilty.

## DECISION

### 1. Jury Composition

After the jury had been sworn, defense counsel brought to the trial court's attention that the 36 potential jurors sent by the jury commissioner were identified by numbers ranging from 163 to 98 and asked for an inquiry about what the court agreed was "a sequential pattern with gaps." (R. 104). The court ordered the jury commissioner to appear for a hearing. When the hearing convened, a person whose remarks suggest she was an employee of the commissioner testified, stating the commissioner was "not here today." (R. 113). She said the potential jurors sent were those who "showed up today for jury duty" starting with the number 163 and going "backwards" until "we got ... 36." (R. 106). A list of the 30 missing juror candidates indicated 3 had simply not reported, and 27 were excused by the commissioner.

Miller argued to the trial court that many excuses were for reasons not authorized by law. She then claimed she was prejudiced because "by excusing eight out of the twenty-nine from Gary, we probably have excused a substantial number of blacks." (R. 122).[1] The court acknowledged that the county's population was "approximately twenty-five percent black" (R. 124), and that only 3 of the 36 potential jurors were black. The court expressed concern for the commissioner's "lack of attention to details" in excusing prospective jurors. However, the court denied Miller's motion for mistrial upon finding that the venire did not

rise[ ] to the level that this defendant is being denied a fair trial or that a jury has been selected who cannot fairly and impartially try this case and that the selection hasn't been taken from a reasonable cross-section of the community, randomly selected.

(R. 126–27).

On appeal, Miller claims her Sixth Amendment right to a jury trial was violated because jurors were not drawn from a fair cross section of the community. To prevail on a Sixth Amendment challenge requires a showing of systematic discrimination. *Smith v. State*, 658 N.E.2d 910, 916 (Ind.Ct.App. 1995), *trans. denied.* The challenger must initially make a *prima facie* showing that there has been a violation of the "fair-cross-section requirement" by demonstrating

'(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.'

*Bradley v. State*, 649 N.E.2d 100, 104 (Ind. 1995) (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587 (1979)). First, Miller's argument about what prevented a fair cross-section focuses solely on the excusing of potential jurors by the commissioner, and she fails to provide any showing that the excused jurors constituted a distinctive group. Next, any analysis addressing Miller's express concern about the lack of black juror candidates is precluded by the total absence of evidence about (1) the race of excused potential jurors, or (2) any "system" employed to excuse jurors of a particular race. Miller failed to carry her burden of making a *prima facie* showing that she was deprived of her Sixth Amendment right to a jury trial by a violation of the fair-

1. The witness provided a list of *30* potential jurors who did not appear but indicated excuses for only 27, the other 3 having simply failed to respond. One potential juror from Gary was a "no show." Thus, only 7 potential Gary jurors were excused.

Further, Miller's argument overlooks the fact that the prospective jurors were called starting with number 163 and going backward for 36 jurors. The result would only have added 2 excused jurors from Gary (shown as "college student" and "vacation"). (R. 118).

cross-section requirement. Accordingly, the trial court did not err in denying her motion for mistrial.

### 2. *Instructions*

Miller asked the trial court to instruct the jury on voluntary manslaughter, involuntary manslaughter, and reckless homicide as lesser included offenses of the crime of murder with which she was charged. The court refused to give the involuntary manslaughter and reckless homicide instructions. Miller claims this was reversible error because evidence supported both these lesser included offenses of murder.

■ When deciding whether an instruction on a lesser included offense must be given, the trial court first must determine whether the alleged lesser included offense is either inherently or factually included in the crime charged. *Wright v. State*, 658 N.E.2d 563, 567 (Ind.1995). If so, the court must then look at the evidence presented by both parties to decide whether there is a serious evidentiary dispute about the element(s) distinguishing the lesser from the greater offense such that a jury could conclude that the lesser included offense was committed but not the greater. *Id.* If the answer to this question is yes, then instruction on the lesser included offense must be given, and failure to give the requested instruction is reversible error. *Id.*

### a. *Reckless Homicide*

■ Reckless homicide is an inherently included offense of murder. *Id.* The difference between reckless homicide and murder is the element of intent: reckless homicide requires a disregard of harm that might result from the conduct, and the murder charged here requires the killing to be intentional or knowing. *See id.* Therefore, the question is whether there is a serious evidentiary dispute about whether Miller acted with (1) the intent to knowingly commit murder—an awareness of a high probability that she was doing so, *see* Ind.Code 35–41–2–2(b), or (2) the intent for reckless homicide—"plain, conscious, and unjustifiable disregard of harm that might result" to Hill. *See* I.C. § 35–41–2–2(c). We agree with the trial court's conclusion that there was not.

■ The evidence indicated that after Miller told Hill to leave, threatened to shoot her, and fired several shots down toward Hill's feet, Miller then pointed the gun toward the area of Hill's face, neck or shoulders and fired again from a close distance. Miller argues the "indiscriminate" nature of the "shots" justified the giving of the lesser included instruction for reckless homicide. Miller's Brief at 17. However, evidence indicated that the shot which killed Hill was the one Miller fired when she pointed the gun at Hill's upper body as Hill turned to enter the car. The intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or serious bodily injury. *Cate v. State*, 644 N.E.2d 546, 548 (Ind.1994). There is simply no evidence supporting the inference that her action was taken without her awareness of the high probability it would result in Hill's death.[2]

### b. *Involuntary Manslaughter*

■ Ind.Code 35–42–1–4 defines involuntary manslaughter as the offense committed when one kills a person while committing battery. Involuntary manslaughter is not an inherently lesser included offense of murder. *Wright*, 658 N.E.2d at 569. However, where the killing was accomplished by a touching, involuntary manslaughter is a factually included offense of murder. *Anderson v. State*, 681 N.E.2d 703, 709 (Ind.1997). To kill with a gunshot is to kill by a touching. *See Lynch v. State*, 571 N.E.2d 537, 538–39

---

**2.** Miller points out that no evidence was presented about the whereabouts of the remains of the six bullets allegedly fired. We fail to appreciate the value of this point for the purpose of supporting the inference that Miller acted recklessly.

Miller notes that the car's driver testified that she did not hear a woman other than Star arguing with Hill. However, the driver also testified repeatedly about the fact that her car had no muffler that night and how that fact impaired her ability to hear what was happening outside the car.

Finally, Miller points to Chicago's testimony that Miller was telling Hill to leave but did not threaten her. However, Chicago got in the car, and therefore his hearing may also have been affected by the lack of a muffler.

(Ind.1991). Because Miller was charged with killing Hill by gunshot, involuntary manslaughter is factually included in the charge of murder here.

Involuntary manslaughter contemplates an incidental killing that occurs during a battery. *Id.* at 538. Thus, the question is whether there was a serious evidentiary dispute about what Miller intended when she shot Hill. The evidence supported the inference that Miller's act of raising the gun and firing at Hill's upper body demonstrated her intent to kill Hill. *See Cate.* However, no evidence was presented which suggested that her doing so simply demonstrated her intent to batter Hill. Therefore, the trial court did not err in concluding that the evidence did not warrant an involuntary manslaughter instruction.

### 3. *Sufficiency of the Evidence*

Finally, Miller contends that insufficient evidence supports her conviction. Specifically, she claims the evidence fails to show her "specific intent to kill" and improperly relies on the "dubious testimony" of Ford. Miller's Brief at 19.

When presented with a challenge to the sufficiency of the evidence, we neither judge questions of credibility nor weigh evidence. *Elmore v. State*, 657 N.E.2d 1216, 1219 (Ind.1995). We look only to the evidence and reasonable inferences therefrom which support the verdict. *Id.* If, from that perspective, there was evidence of probative value from which a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt, we will affirm the conviction. *Id.*

Miller reminds us that testimony indicated she had fired five shots at the ground, and the bullet that struck Hill may have ricocheted off the ground. However, Ford testified that it was after the sixth shot, which was fired when Miller pointed the gun at Hill's upper body, that Hill fell into the car and blood came from her mouth. This evidence of probative value supports the inference that the sixth shot struck Hill. Noting once again that the intent to kill may be inferred from the deliberate act of using a deadly weapon against another in a manner likely to cause death or serious injury, *see Cate*, 644 N.E.2d at 548, sufficient evidence supported the inference that Miller fired the sixth shot with the intent to kill.

We impinge on the jury's responsibility to judge the credibility of witnesses *only* when "a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt." *Tillman v. State*, 642 N.E.2d 221, 223 (Ind.1994). This "incredible dubiosity rule," *id.*, is not applicable here because Ford testified unequivocally that she saw Miller shoot Hill. (R. 175). Miller says Ford's testimony was inconsistent with earlier statements, but does not elaborate. She reminds us that the only two other witnesses present during the shooting said they did not see Miller shoot at Hill; however, she fails to recognize the numerous other points upon which Ford's testimony was corroborated by these witnesses. Miller's argument that the conviction must fail because it relies upon the dubious testimony of Ford fails.

We affirm.

SHARPNACK, C.J., and STATON, J., concur.