OPINION
{¶ 1} Defendant, Rufus Humphrey, appeals from his conviction and sentence for engaging in a pattern of corrupt activity, trafficking in cocaine, and possession of cocaine.
 {¶ 2} The evidence presented by the State at trial demonstrates that Tim Humphrey was a drug dealer who distributed large quantities of cocaine in Springfield, Ohio. One of the people that Tim Humphrey worked closely with in distributing drugs was his cousin, Defendant Rufus Humphrey.
 {¶ 3} On or about May 21, 2000, Springfield police began an investigation of Tim and Rufus Humphrey. Police utilized the services of a confidential informant, Alex Williams, to make controlled buys of cocaine from both Tim and Rufus Humphrey, and recorded several phone conversations between the informant and the two suspects.
 {¶ 4} During the police investigation both Tim and Rufus Humphrey engaged in several specific incidents of drug related activity, working together to sell and distribute cocaine. For instance, on May 21, 2000, informant Williams was present in the barber shop operated by Defendant, along with Tim Humphrey, Leonard Dixon, and Rodney White. At that time Tim Humphrey had in his possession a gym bag containing three or four kilos of cocaine, along with two or three pounds of marijuana. With Defendant present, Tim Humphrey sold Leonard Dixon one kilo of cocaine for twenty-six thousand dollars. Tim Humphrey also offered to sell Williams a quarter kilo for nine thousand dollars, did sell cocaine to Rodney White, and gave a quantity of cocaine to Defendant.
 {¶ 5} On May 23, 2000, Williams and Tim Humphrey had a phone conversation during which Williams arranged a purchase of cocaine. The following day, May 24, 2000, Williams and Tim Humphrey had another phone conversation during which Tim Humphrey told Williams that he was going to be out of town and that Defendant would make the sale for him to Williams. A few minutes later Defendant paged Williams.
 {¶ 6} When Williams called Defendant he said Tim Humphrey had talked to him about selling some cocaine to Williams and had given him four ounces to sell, that the transaction would take place at Defendant's home, 522 W. Parkwood Avenue, and that the price would be one thousand two hundred dollars for one ounce of cocaine. Williams went to Defendant's home where he made a controlled buy of one ounce of cocaine from Defendant for one thousand two hundred dollars. At that time Williams observed four ounces of cocaine in Defendant's possession.
 {¶ 7} On May 30, 2000, Tim Humphrey met Williams at BW-3's Restaurant where Williams made a controlled buy of three fourths of an ounce of cocaine for eight hundred dollars. This transaction was videotaped. Williams had wanted to purchase five ounces on that occasion but Tim Humphrey did not have that quantity available to him.
 {¶ 8} On June 11, 2000, Williams and Tim Humphrey had a phone conversation wherein Tim Humphrey indicated that his shipment of cocaine had arrived. Williams stated that he wanted to purchase five ounces. Tim Humphrey told Williams to meet with Defendant to make his purchase, but Williams said he would only deal with Tim Humphrey.
 {¶ 9} The next day, June 12, 2000, Williams and Tim Humphrey had several phone conversations arranging the sale of five ounces to Williams. During one of those conversations, Tim Humphrey told Williams that earlier in the morning he had delivered one-half kilo to Defendant and that he was waiting for Defendant to bring five ounces back to him so he could make the sale to Williams.
 {¶ 10} Later that same day, Williams proceeded to Tim Humphrey's home, at 1117 W. High Street, where he made a controlled purchase of five ounces of cocaine from Tim Humphrey for five thousand two hundred dollars. This transaction took place in the backyard and was videotaped.
 {¶ 11} On June 13, 2000, Williams and Tim Humphrey had a phone conversation wherein Tim Humphrey stated his shipment had arrived and he expected to sell it in one-half kilos for seventeen thousand dollars each. The next day, June 14, 2000, Williams went to Tim Humphrey's home where he observed three or four kilos of cocaine in Tim Humphrey's possession. Subsequently, on June 26, 2000, Tim Humphrey called Williams and said another shipment had arrived and that he had fifty ounces to sell.
 {¶ 12} As a result of these events, Defendant and Tim Humphrey were jointly indicted on several charges. Defendant was charged with engaging in a pattern of corrupt activity, R.C. 2923.32, with predicate acts reflecting his involvement in the May 24, 2000, and June 12, 2000, drug transactions. He was also charged with trafficking in cocaine, R.C.2925.03, and possession of cocaine, R.C. 2925.11.
 {¶ 13} Defendant's motion for separate trials was denied, and he and Tim Humphrey were tried together before a jury. Defendant was found guilty on all charges and the trial court sentenced him to consecutive terms of imprisonment totaling ten years, and fines totaling forty thousand dollars.
 {¶ 14} Defendant has timely appealed to this court from his convictions and sentences.
 FIRST ASSIGNMENT OF ERROR {¶ 15} "The trial court erred in failing to discharge Rufus Humphrey pursuant to Ohio's speedy trial statute R.C. 2945.71."
 {¶ 16} Defendant argues that the trial court erred in failing to dismiss the charges against him because his speedy trial rights were violated. On this record that claim lacks merit.
 {¶ 17} A review of this record demonstrates that Defendant failed to move for dismissal or discharge for a violation of his speedy trial rights pursuant to R.C. 2945.73(B), either orally or in writing, during or prior to the trial. While the co-defendant, Tim Humphrey, moved for dismissal for want of a speedy trial, Defendant did not join in that motion. Defendant's failure to seek the relief concerned precludes Defendant from now raising that issue on appeal. State v. Thompson
(1994), 97 Ohio App.3d 183, 186-187; State v. Taylor, 98 Ohio St.3d 27,2002-Ohio-7017.
 {¶ 18} In any event, Defendant was brought to trial within the required time period. A person against whom a felony charge is pending must be brought to trial within two hundred seventy days after his arrest. R.C. 2945.71(C). Each day the accused is held in jail in lieu of bail on the pending charge counts as three days in computing that time period. R.C. 2945.71(E).
 {¶ 19} Defendant was charged by indictment with three felony offenses on August 27, 2001. He was arrested on those charges on August 31, 2001. Defendant remained in jail until September 7, 2001, when he posted bond. Trial began on January 22, 2002.
 {¶ 20} Defendant spent seven days in jail on these charges, August 31, 2001 to September 7, 2001. Applying the triple credit provision in R.C. 2945.71(E), a total of twenty-one days expired during that period. From September 7, 2001 — January 22, 2002, the start of trial, another one hundred thirty seven days expired. Added to the previous twenty-one days, a total of one hundred fifty-eight days expired before Defendant was brought to trial. This is well within the two hundred seventy day limit. Defendant's speedy trial rights were not violated.
 {¶ 21} The first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR {¶ 22} "The evidence presented at trial was insufficient as a matter of law to support a conviction against Rufus Humphrey for violation of R.C. 2923.32(A)(1) "a pattern of corrupt activity."
 {¶ 23} Defendant was convicted of engaging in a pattern of corrupt activity in violation of R.C. 2923.32, which provides in relevant part:
 {¶ 24} "(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."
 {¶ 25} "Enterprise" as defined in R.C. 2923.31(C) includes:
 {¶ 26} "An individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. `Enterprise' includes illicit as well as licit enterprises."
 {¶ 27} "Corrupt activity" as defined in R.C. 2923.31(I) includes engaging in, attempting to engage in, conspiring to engage in, or soliciting another person to engage in any violation of R.C. 2925.03 or2925.11 that is a felony of the first, second, third or fourth degree.
 {¶ 28} "Pattern of corrupt activity" as defined in R.C. 2923.31(E) means:
 {¶ 29} "Two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."
 {¶ 30} A sufficiency of the evidence argument challenges whether the State presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991), 61 Ohio St.3d 259:
 {¶ 31} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 32} Defendant argues that the evidence presented by the State was insufficient to sustain his conviction for engaging in a pattern of corrupt activity because the State failed to prove the existence of an "enterprise"; that either the trucking business operated by co-defendant Tim Humphrey or Defendant's barber shop was the organization involved with distributing illegal drugs with which Defendant was associated and in which he participated through a pattern of corrupt acts.
 {¶ 33} Defendant fails to comprehend that the "enterprise" in this case was not a business or formal organization. Rather, consistent with R.C. 2923.31(C) it was "a group of persons (Tim Humphrey and Rufus Humphrey) associated in fact, although not a legal entity," who were working closely together as a continuing unit in an ongoing effort to distribute cocaine in the Springfield area.
 {¶ 34} The State's evidence clearly demonstrates that a group of persons, Tim and Rufus Humphrey, associated together for the common purpose of engaging in a course of criminal conduct; distributing illegal drugs such as cocaine in the Springfield area. Moreover, this was an ongoing organization or entity whose members functioned as a continuing unit. That is sufficient to demonstrate the existence of an "enterprise."United States v. Turkette (1981), 452 U.S. 576, 583. Additionally, the "pattern of corrupt activity" in this case was the series of corrupt acts involving specific incidents of illegal drug activity committed by the participants in the enterprise. Id.
 {¶ 35} The evidence demonstrates that both Tim Humphrey and Defendant participated in this enterprise by continually engaging in a pattern of corrupt acts involving the possession and sale of cocaine. A specific incident of that corrupt activity occurred on May 21, 2000, inside Defendant's barber shop. Defendant was present when Tim Humphrey, who was in possession of three or four kilos of cocaine, sold Leonard Dixon one kilo of cocaine for twenty-six thousand dollars, and then offered the informant in this case one-fourth of a kilo for nine thousand dollars. Tim Humphrey also gave Defendant a quantity of cocaine on that occasion.
 {¶ 36} Another incident of corrupt activity occurred on May 24, 2000. Tim Humphrey had provided Defendant with several ounces of cocaine to sell to the informant and other people while Tim Humphrey was out of town. On May 24th the informant came to Defendant's home, at which time Defendant sold the informant one ounce of cocaine for one thousand two hundred dollars.
 {¶ 37} Another incident of corrupt activity took place on June 12, 2000. After Tim Humphrey had provided Defendant with one-half kilo of cocaine to sell, Tim Humphrey arranged a sale of five ounces of cocaine to the informant. When the informant indicated he would only deal with Tim Humphrey, Defendant returned five ounces of cocaine to allow him to complete that sale to the informant.
 {¶ 38} Viewing the evidence presented in this case in a light most favorable to the State, a rational trier of facts could conclude that all of the elements of engaging in a pattern of corrupt activity were proved beyond a reasonable doubt. Defendant's conviction is supported by legally sufficient evidence.
 {¶ 39} The second assignment of error is overruled.
 THIRD ASSIGNMENT OF ERROR {¶ 40} "The trial court erred by failing to impanel a proper jury and denying counsel's challenge to the venire."
 {¶ 41} Defendant argues that he was denied his constitutional right to a fair and impartial jury because the jury venire did not represent a fair cross section of the community. Specifically, Defendant complains because the array of petit jurors did not include a single African-American despite the fact Springfield is comprised of about twenty-six per cent African-Americans.
 {¶ 42} The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to have a jury chosen from a fair cross section of the community. Duren v. Missouri
(1979), 439 U.S. 357; State v. Puente (1982), 69 Ohio St.2d 136. In order to ensure this constitutional guarantee, the jury must be selected without the systematic or intentional exclusion of any cognizable group.State v. Buell (1985), 29 Ohio App.3d 215, 217. In order to establish a violation of the fair cross section requirement, Defendant must demonstrate three things: (1) that the group alleged to be excluded is a distinctive group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) the under-representation is due to systematic exclusion of the group in the jury selection process. Duren, supra; Puente, supra.
 {¶ 43} Defendant challenged the array of petit jurors at the commencement of trial for an under-representation of African-Americans. In overruling that challenge, the trial court noted that it was present when the jury venire was drawn, and the trial court took judicial notice that selection of the array of petit jurors was done randomly by computer program from voter registration lists and that there was no systematic exclusion of any group. Nevertheless, Defendant requested an opportunity to present evidence, particularly with respect to the twenty-five potential jurors who were included in the pool but did not appear in court because they had been previously excused from jury service.
 {¶ 44} A hearing was held. The presiding judge's bailiff, Dee Gibson, testified regarding some of the reasons why people were excused from jury service in this case: employment concerns, student, caretaker of older relative, transportation concerns, under a doctor's care, etc. Ms. Gibson indicated that potential jurors called for duty communicate their request to be excused to the court and that those requests are then acted upon orally. No written records are kept. Ms. Gibson testified that to her knowledge only one other time in the past fifteen years has an array of petit jurors failed to include any African-Americans. She also testified that no person was excused from jury service in this case because of race, nor is she aware of any case where that occurred. At the conclusion of the hearing the trial court overruled Defendant's challenge to the array of petit jurors.
 {¶ 45} R.C. 2313.01 requires the courts of common pleas to appoint jury commissioners, who are charged in subsequent sections of that chapter to compose jury lists and draw names of persons from the list for jury service. Reasons for exemptions from service appear variously in R.C. 2313.01 through R.C. 2313.46. In that connection, R.C. 2313.12
requires the jury commissioners to decide upon exemptions from service that are requested, and to "keep a record . . . of all persons exempted and the time and reasons for such exemption." That same section permits the court to grant exemptions upon a written application. R.C. 2313.04
permits the jury commissioners to authorize a deputy to act in their place in granting exemptions.
 {¶ 46} It is not clear whether Ms. Gibson granted exemptions on behalf of the presiding judge or the jury commissioners, acting as their deputy. Whether a judge can delegate a task the jury is charged by law to perform is questionable. Applications to the court must be in writing, and the court's decision must be journalized, creating a record of the exemption. If Ms. Gibson acted as the commissioners' deputy, she is required to keep a record of exemptions just as the commissioners are. Failure to do those things prevented this Defendant from learning why specific persons who were called to serve were excused.
 {¶ 47} It may be that the procedure used undermined the fairness of the random computer method by which prospective jurors are selected. To find that it did, we would have to assume that substantially more African-Americans than other persons requested and received exemptions in this unorthodox manner, which we cannot on this record do. Absent a showing that a defendant has been prejudiced, minor or technical defects in jury selection will not result in reversal of a conviction. State v.Puente.
 {¶ 48} The relevant community from which jurors are drawn is not the City of Springfield but Clark County. The 2000 United States Census figures demonstrate that the percentage of African-Americans living in Clark County is 8.9%, not 26%. More importantly, the record before us clearly demonstrates that Defendant failed to meet his burden of showing that the under-representation of African-Americans on his jury venire was due to systematic exclusion in the jury selection process.
 {¶ 49} The third assignment of error is overruled.
 FOURTH ASSIGNMENT OF ERROR {¶ 50} "The trial court erred by failing to grant the motion to sever."
 {¶ 51} Crim.R. 8(B) governs joinder of defendants and provides:
 {¶ 52} "Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count."
 {¶ 53} Crim.R. 14 provides for relief from prejudicial joinder and states in relevant part:
 {¶ 54} "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. In ruling on a motion by a defendant for severance, the court shall order the prosecuting attorney to deliver to the court for inspection pursuant to Rule 16(B)(1)(a) any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial."
 {¶ 55} The decision whether to grant a motion for separate trials is a matter resting within the trial court's sound discretion, and a reviewing court will not disturb that decision on appeal absent a showing that the trial court abused its discretion. State v. Torres (1981),66 Ohio St.2d 340. An abuse of discretion connotes more than just an error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court.State v. Adams (1980), 62 Ohio St.2d 151.
 {¶ 56} Defendant and his co-defendant, Tim Humphrey, were jointly indicted for engaging in a pattern of corrupt activity involving the possession and sale of cocaine. Joinder was proper because the State alleged that these defendants participated together in the same corrupt predicate acts giving rise to their offenses. Defendant filed a motion prior to trial seeking a separate trial from his co-defendant. Defendant did not allege, however, any specific prejudice he had suffered or would suffer as a result of the joinder. Torres, supra. The trial court apparently overruled Defendant's motion for severance, although that is not made manifest by this record.
 {¶ 57} During the trial, Det. Woodruff testified regarding several recorded phone conversations he overheard between the confidential informant and Tim Humphrey on June 12, 2000. Those conversations concerned the informant's purchase of five ounces of cocaine from Tim Humphrey. During one of those conversations, Tim Humphrey stated that he had delivered one-half kilo of cocaine to Defendant earlier that morning, and was then waiting for Defendant to return five ounces of the cocaine so he could complete the sale to the informant.
 {¶ 58} Just prior to the State's playing for the jury the audiotapes of that recorded phone conversation, State Exhibits 8 and 9, Defendant renewed his motion for severance. Defendant argued, as he does on appeal, that joinder denied him his Sixth Amendment right of confrontation because the playing of those tapes containing a statement by the co-defendant implicating Defendant in illegal drug activity created a "Bruton" problem. See Bruton v. United States (1968),391 U.S. 123. We disagree.
 {¶ 59} A Bruton problem arises in a joint trial of two or more defendants when the trial court admits into evidence a confession or statement by a non-testifying defendant that implicates the other defendant(s) in criminal activity. That is not what happened here. The declarant of the statement implicating Defendant in illegal drug activity, Tim Humphrey, testified at trial and was subject to cross-examination. In fact, Defendant cross-examined Tim Humphrey but did not question him about the statement he made to the informant on June 12, 2000, implicating Defendant in criminal activity. Defendant did elicit during cross-examination that Tim Humphrey had no information indicating that Defendant was involved in drug activity.
 {¶ 60} Clearly, Defendant had an opportunity for effective cross-examination of Tim Humphrey regarding his statement to the informant implicating Defendant. That is all the Sixth Amendment confrontation clause guarantees. United States v. Owens (1988),484 U.S. 554. Defendant's confrontation rights were not violated. Moreover, Defendant's suggestion that his joinder and the fact that the co-defendant chose to testify at trial somehow denied him the opportunity to take the stand and testify in his own defense, out of fear of giving the jury the impression that he was attacking the co-defendant, has nothing to do with Defendant's confrontation rights. That simply involves tactical choices, and there is nothing in this record to suggest that Defendant's decision to not testify was the result of anything other than his own voluntary choice.
 {¶ 61} The fourth assignment of error is overruled. The judgment of the trial court will be affirmed.
FAIN, P.J. and YOUNG, J., concur.