NO.
12-04-00301-CR

 

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

 

 

JOHNICA LYNN PRYOR,   §          APPEAL
FROM THE 8TH

APPELLANT

 

V.        §          JUDICIAL
DISTRICT COURT OF

 

THE STATE OF TEXAS,

APPELLEE   §          RAINS
COUNTY, TEXAS

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



MEMORANDUM OPINION

            Johnica Lynn
Pryor appeals his conviction for aggravated kidnapping, for which he was
sentenced to imprisonment for thirty-eight years.  Appellant raises three issues on appeal.  We affirm.

Background

            Appellant
was charged by indictment with the aggravated kidnapping of Serina
Thompson.  Appellant pleaded guilty, and
the matter proceeded to voir dire.  Prior
to the commencement of voir dire proceedings, Appellant made the following
objection:

 

The first motion I’d
make, Your Honor, is an objection to the panel as a whole.  It is not a fairly mixed panel.  It is clear from viewing the panel that it is
all white except for one potential juror who is black.  We have a black defendant in this case
accused of raping a white woman, and this panel will deny my client of the
opportunity to be tried by a panel of his peers.  And the selection of the jury panel does not
reflect the racial mix of the community in Rains County, Texas.  So, we would ask that the panel be struck and
a new panel be drawn that reflects correctly a fair mix among -- racially, in
Rains County.

 

The trial court carried Appellant’s
motion to strike the panel.  Appellant
later made a motion to shuffle the jury panel, which the trial court
granted.  Following voir dire, the matter
proceeded to trial.








            The
State called Rains County Chief Jailer Annette Foster as its first
witness.  Foster testified with regard to
the jail radio log for the shift scheduled from 3:00 p.m. on October 11, 2003
to 1:00 a.m. on October 12, 2003.  Foster
testified that the log indicated that Unit 506 had responded to Appellant’s
residence at 9:27 p.m. on October 11, 2003 regarding a call that Appellant had
taken Thompson against her will.  Foster
further testified with regard to a call sheet and stated that Crystal Willis
walked into the lobby and reported that Thompson had been taken against her
will.  Foster also testified that the log
indicated that a 9-1-1 call was received from an unknown caller between 9:25
p.m. and 10:43 p.m. advising that Appellant “has made it home and is trying to
fight.”  Finally, Foster stated that the
call sheet showed that Unit 506 had taken Appellant into custody and was en
route to the station by 11:42 p.m.  On
cross examination, Foster testified that Appellant was in jail prior to the
date in question and that Thompson had deposited forty dollars into Appellant’s
commissary on October 7, 2003.  Foster
further stated that her records indicated that Appellant sent Thompson a letter
in November 2003 and that Appellant received two letters from Thompson’s
address in December 2003.  Moreover,
Foster testified that Thompson had come to the jail on more than one occasion
and had visited Appellant on December 2, 2003.

            Angel
Willis was the next witness to testify for the State.  Willis testified that Thompson had come to
her residence on the night in question and that the two had planned to go to a
club that night.  Willis further
testified that Thompson was well dressed and that her hair was fixed.  Willis stated that she was in her room when
Thompson opened the front door and found Appellant standing outside.  Willis further stated that Appellant tried to
pull Thompson outside, but that Thompson pulled away exclaiming that she was
not going anywhere with Appellant.  Willis
testified that Appellant grabbed Thompson, either by her ear, the back of her
neck, or her hair, and pulled her out of the house into the yard.  As Appellant pulled her away, according to
Willis, Thompson called to her to call the police.  Willis returned from inside the house[1]
to see Appellant pushing Thompson into his truck.  Willis stated that Appellant drove off with
Thompson, who was screaming.  Willis made
an in court identification of Appellant as the man who took Thompson from her
house and stated that it did not appear to her that Thompson went with
Appellant willingly.

            Willis
went to the police station and reported to the deputy that Appellant had taken
Thompson from her house.  Willis further
made a written statement at the police station before returning home.  Willis testified that later that evening she
received a phone call from Appellant’s sister, who told her that Thompson was
at their house and wanted Willis to come over there.  

            Willis
testified that when she arrived at Appellant’s sisters’ house, Thompson
appeared distressed, upset, and worried as she spoke to someone on the
telephone.  Willis stated that Thompson’s
hair was “ruffled up” and her tee shirt was inside out.  Willis further stated that Thompson’s clothes
were dirty.  Willis testified that a
police officer came to the house and that she saw Thompson make a written
statement.  A short time later, Thompson
left with her sister, Cindy, and Willis returned home.  Willis stated that she later received a phone
call from Cindy, who told her that Thompson had been raped and wanted Willis to
take her to the hospital.

            Willis
testified that she accompanied Thompson to the hospital and that Thompson was given
an exam.  Willis stated that Thompson had
bruises on her arms.  Willis further
stated that she took Thompson back to Thompson’s sister’s house afterwards.

            Thompson
testified as the State’s next witness. 
Thompson stated that she lived with Appellant for seven years and that
they had two children.  Thompson
testified that she ceased living with Appellant in August 2003 and had moved in
with her grandmother.  Thompson further
testified that she had started seeing another man after leaving Appellant, which
had upset Appellant, but that she still saw Appellant occasionally and had
continued a sexual relationship with him. 
Thompson stated that Appellant was continually calling her asking her to
come back, but that she had stopped taking his calls about one week prior to
the date in question.  

            Thompson
related that on October 11, 2003, Appellant was waiting for her when she
arrived at work.  When Thompson went to
the police station, Appellant followed her. 
Thompson had an officer escort her back to work.  Thompson testified that she went to Willis’s
house that evening.  Thompson stated that
as she opened the door to leave, she discovered Appellant standing
outside.  Thompson stated that Appellant
grabbed her and tried to get her into his truck, telling her that she was going
to talk to him that night.  Thompson
further stated that she kicked, screamed, and grabbed a pole in the front yard
in an attempt to prevent going with Appellant.[2]  Moreover, Thompson stated that she screamed
to Willis to call the police.  Thompson
testified that as Appellant threw her into his truck, he continually hit her.

            According
to Thompson, Appellant then drove her down a dark road while holding her head
down.  Thompson testified that Appellant
stopped the truck in an open field, the location as to which she was not
certain.  Thompson stated that Appellant
demanded to know with whom she was sleeping. 
Thompson did not respond because “there was nothing to tell.”  Thompson further stated that whenever she did
speak, Appellant hit her.

            Next,
according to Thompson’s testimony, Appellant dragged her out of the truck,
ripped her clothes off, tied her to the truck using a “net tailgate,” and raped
her.  Thompson further related that
Appellant kept asking her if she knew how to swim, telling her she was going to
drown that night.  Thompson also
testified that Appellant put something sharp to her throat and stated that he
would cut her with a knife.  However,
Thompson clarified that she did not know if the sharp object Appellant was
holding to her throat was, in fact, a knife.

            Thompson
testified that Appellant later drove them to his trailer house and told her to
wait in the truck while he went inside to get his gun.  Thompson stated that she was scared.  Thompson further stated that Appellant’s
sisters, Tamekia and Karenda Pryor, his aunt, Judy Fields, and his grandmother
were standing in their front yard when they arrived.  They came over to the truck, and Karenda
asked Thompson to get out of the truck. 
Thompson stated that she went into their house with them and sat down on
the couch.[3]  Thompson further stated that Appellant soon
came to the house, but left when he was informed that the police were on the
way.  

            Thompson
testified that when her sister arrived at the Pryor house, she told Cindy she
had been raped.  Thompson stated that she
gave a written police report at the house, but that there were details omitted
from it because, at the time, she was scared and wanted to go home.  Thompson further related that she later went
to the hospital and received a sexual assault exam.

            Amber
Welch testified as the State’s next witness. 
Welch testified that she is a nurse’s aid and a coworker of Thompson’s
sister.  Welch stated that she saw
Thompson on the night of October 11, 2003 and that Thompson was dressed up
and appeared happy and excited.  Welch
further stated that Thompson’s hair was done and that she was wearing
Abercrombie jeans, black dress shoes, and a tee shirt.  Welch testified that she next saw Thompson at
Appellant’s sisters’ house later that night. 
Welch further testified that Thompson, at that time, looked clueless and
in shock, and did not speak to Welch. 
Welch stated that Thompson was then wearing a dirty white tee shirt that
was inside out and backwards.  Welch
further stated that Thompson’s face was flushed as though she had been crying
and that there were marks on the insides of her arms.  Welch related that Thompson told her that
Appellant took her against her will, that he took her to the woods, and that he
sexually assaulted her.

            The
State’s final witness was Laura Bankston. 
Bankston testified that she is a nurse in the emergency room at
Greenville Presbyterian Hospital. 
Although she is not certified as a Sexual Assault Nurse Examiner, she
has thirty-nine years of experience and is a certified emergency nurse.  Bankston testified that when Thompson came to
the emergency room, she was cooperative, but had a flat, “zombie like affect.”  Bankston further testified that Thompson had
an abrasion to her forearms, her chest, her breast, her arm, and her back
consistent with the photos in Bankston’s report, which was admitted into
evidence.  Bankston further testified
that Thompson’s arms looked as if something had been wrapped around them.  Bankston related that Thompson had tears and
swelling in her vaginal area consistent with a sexual assault.  Bankston further stated that tearing such as
Thompson had does not usually occur with consensual sex, although she agreed that
some of the abrasions could have resulted were a person to have consensual sex
on the ground in a pasture.  Bankston
denied that the abrasions on Thompson’s arms could have been caused by a “little
scuffle” as the abrasions did not look like hand prints.  Bankston testified that other injuries to
Thompson’s arms were consistent with blows from fists.  Bankston further testified that some bruises
sustained by Thompson may not have been visible at the time she visited the
emergency room.  Bankston noted that the
clothing log reflected that Thompson was wearing jeans, a tee shirt, and a
black belt, but no panties or bra. 
Bankston further stated that Dr. Scott Pierce, the attending physician,
noted on Thompson’s chart that his impression from the exam was that Thompson
very likely sustained “some forceful vaginal penetration.”  Bankston testified that based upon her
thirty-nine years of emergency room experience, she had no doubt that Thompson
was sexually assaulted.  Following
Bankston’s testimony, the State rested.

            Appellant’s
sister Tamekia Pryor testified as the first witness on Appellant’s behalf.  Tamekia stated that she received a telephone
call from her mother informing her that Willis had reported that Appellant was
holding Thompson against her will. 
Tamekia went to her front door and saw that the police were in her front
yard.  Tamekia testified that an officer
asked her if Appellant was there, and that they left to look for Appellant upon
her response that Appellant was not at the house.  Tamekia testified that shortly thereafter,
Appellant and Thompson arrived in Appellant’s truck.  Tamekia stated that Thompson looked neither
distressed nor excited.  Tamekia noted
that Thompson was wearing tight jeans and a white tee shirt.  Tamekia stated that Thompson’s hair was neat
and she was clean.  Tamekia further
stated that Thompson went into the house with them and told them that Appellant
took her to an unknown place, tied her up, and “drug” her.  Tamekia denied that Thompson told her that
Appellant had raped her.  Tamekia further
related that Thompson seemed confused while making her written statement to
police and stated that she did not know “how to word” it.

            Judy
Fields was the next witness to testify on Appellant’s behalf.  Fields testified that she was visiting her
mother when her mother, who was listening to a police scanner, heard that
Willis was at the police station making a complaint and that the police were
looking for Appellant.  Fields further
testified that she and her mother went to question Willis, and that Willis told
them that Thompson had gone out to the truck to talk with Appellant, but had
shouted out to Willis to call the police. 
Fields stated that she was at the Pryor sisters’ house when Appellant
returned with Thompson.  Fields further
stated that when they went in the house, Thompson was very quiet and described
how Appellant took her to an unknown piece of land, tied her up, and held
something to her throat.  Fields noted
that Thompson later stated that she and Appellant had sex.  Fields testified that she saw no bruises on
Thompson’s body, but also admitted that she had not lifted Thompson’s shirt to
notice the bruising apparent in the pictures in evidence.  Fields also described Thompson as confused
while making a written statement to police.

            James
Ehlers, a friend of Appellant, also testified on Appellant’s behalf.  Ehlers testified that he sometimes watched
Appellant’s children when Thompson came by Appellant’s trailer following their
separation.  Ehlers further testified
that he was with Appellant on the evening in question.  Ehlers stated that he fell asleep on
Appellant’s recliner and was awakened by Karenda, who was asking him where
Appellant was.  Ehlers testified that he
was sitting in the front yard with Appellant’s family members when Appellant
arrived.  Ehlers saw Appellant go inside
his house and heard Appellant state that he was going into his trailer to get
his cell phone.

            Joe
Porter, Appellant’s uncle, was the next witness to testify.  Porter stated that he saw Appellant and
Thompson driving two vehicles by his shop on three occasions before October 11,
2003.  Porter further testified that he
was outside of Appellant’s sisters’ house when Appellant arrived with Thompson
on the night in question.  Porter related
that Karenda Pryor called to Thompson to get out of the truck and that Thompson
went into the house with Appellant’s sisters.

            Christopher
Rhodes, another friend of Appellant, testified next on Appellant’s behalf.  Rhodes stated that he parked his camper next
to Appellant’s trailer during August and September 2003.  Rhodes further stated that he saw Thompson
bring her children over on a routine basis to stay with Appellant.  Rhodes testified that Thompson would let the
kids play in the yard and go into the trailer with Appellant for thirty to
forty-five minutes before she left for work. 
Rhodes further testified that Thompson would bring Appellant food and
visit with him for another hour after work when she came to pick up the
children.[4]

            Mark
Horrocks testified as Appellant’s next witness. 
Horrocks testified that Appellant and Thompson met at Horrocks’s house a
couple of days before the date in question. 
Horrocks stated that he left Appellant and Thompson at his house for a
couple of hours so they could be alone. 
Horrocks further stated that he had let Appellant and Thompson use his
house on at least four prior occasions.

            Deputy
Sheriff Jerry Wayne Husky was the final witness called by Appellant.  Husky testified that he was the investigating
officer on the case.  Husky stated that
he arrested Appellant at around 11:00 p.m. on the night in question.  Husky testified that he searched for, but
never found Thompson’s bra, panties, and shirt. 
Husky further testified that he interviewed Thompson during his
investigation and found some of the details she related to him during his
investigation to be inconsistent with her initial written statement.  With regard to the phone records from the
jail, Husky related that the records indicated one hundred forty-four calls in
eighteen days from the jail to the Sonic,[5] only eight of which
were accepted.

            At
the conclusion of Husky’s testimony, Appellant rested.  Following closing arguments, the case was
submitted to the jury, and the jury began deliberating.  After deliberating for three and one half
hours, the jury sent the following note to the trial judge: “We are at a six to
six split.  It appears there will not be
any further movement.”  The court, over
Appellant’s objection, read the following response to the jury:

 

This is in
response to your note, which I have designated jury note number three, in which
you indicate that you’re at a real impasse. 
If this jury finds itself unable to arrive at a unanimous verdict, it
will be necessary for the Court to declare a mistrial and discharge the
jury.  The indictment will still be
pending, and it’s reasonable to assume that this case will be tried again
before another jury at some future time. 
Any such future jury will be impaneled in the same way this jury has
been impaneled and will likely hear the same evidence which has been presented
to this jury.  The questions to be
determined by that jury will be the same questions confronting you, and there’s
no reason to hope that the next jury will find these questions any easier to
decide tha[n] you’ve found them.  With
this additional instruction, you’re requested to continue deliberations in an
effort to arrive at a verdict that is acceptable to all members of the jury if
you can do so without violence to your conscience.  Don’t do violence to your conscience, but
continue deliberating.

 

Ultimately, the jury found Appellant
guilty as charged.  Following a trial on
punishment, the jury assessed Appellant’s punishment at imprisonment for
thirty-eight years.  The trial court
sentenced Appellant accordingly, and this appeal followed.

 

Jury as a
Representative Sample of the Community

            In
his first issue, Appellant argues that the trial court violated his Sixth
Amendment rights when it empaneled, over his objection, an all white jury in a
case in which Appellant, who is African American, is accused of sexually
assaulting Thompson, a white woman.

            As
set forth in Duren v. Missouri, 439 U.S.357, 364, 99 S. Ct. 664,
668, 58 L. Ed. 2d 579 (1979), in order to establish a prima facie violation of
the requirement that there be a fair cross section of the community
represented, the appellant must show (1) that the group alleged to be excluded
is a “distinctive” group in the community, (2) that the representation of this
group in venires from which juries are selected is not fair and reasonable in
relation to the number of such persons in the community, and (3) that this
underrepresentation is due to systematic exclusion of the group in the jury
selection process.  See Pondexter
v. State, 942 S.W.2d 577, 580 (Tex. Crim. App. 1996).

            In
the case at hand, Appellant cites Pondexter, but declines to
engage in any analysis of the case at hand under the framework set forth
therein.  Rather, Appellant states that
the court of criminal appeals’ threefold burden is “insurmountable.”  The remainder of authority cited by Appellant
relates to Appellant’s contention that an all white jury cannot realistically
be expected to satisfy a criminal defendant’s constitutional protections when
that criminal defendant is African American.[6]

            In
spite of Appellant’s assertion that his burden under Pondexter is
insurmountable, we are nonetheless bound by such a standard as set forth by the
court of criminal appeals.  Thus, by his
failure to make a cogent argument with regard to the three elements set forth
in Pondexter, Appellant has waived the issue.  See Tex. R. App. P. 38.1(h). 
Appellant’s first issue is overruled.[7]

 

Allen Charge

            In
his second issue, Appellant argues that the trial court’s Allen[8]
charge had a coercive effect on the jury in its conviction of Appellant.  The totality of Appellant’s argument
supporting his second issue in his brief is as follows:

 

It is well
established that the focus of any reviewing court is to scrutinize an Allen
charge in light of all the circumstances. 
Howard v. State, 941 S.W.2d 102, 123 (Tex. Crim. App.
1996).  In this case, and for the reasons
given by trial counsel,[9]
there is no question that the effect of the trial court’s Allen charge
as set forth in the Statement of Facts had a coercive effect.  Before, the jurors  were at a six-to-six split.  After the instruction, the jury came back
with a conviction.

 








            The
primary inquiry to determine the propriety of an Allen or “dynamite”
charge is its coercive effect on juror deliberation, “in its context and under
all circumstances.”  Howard,
941 S.W.2d at 123.  A supplemental charge
that suggests that all jurors reevaluate their opinions in the face of
disparate viewpoints cannot be said to be coercive on its face.  See id.  Yet Appellant essentially argues that any Allen
charge given, after which a jury convicts a defendant, necessarily has an
unduly coercive effect given the unfavorable result to the defendant.  Appellant cites no authority supporting such
a contention, and such a result is at odds with the authority Appellant has
cited. See, e.g., Howard, 941 S.W.2d at 123–24.

            Here,
the trial court did not shade its instruction with coercive nuance.  Its instruction did not identify any juror
viewpoints.  Rather, the trial court
instructed the jury to continue deliberations in an effort to arrive at a
verdict that is acceptable to all its members, but only if such members could
do so without violence to each member’s individual conscience.  Thus, we cannot conclude that there is any
coercive suggestion in the trial court’s instruction.  Id.  Appellant’s second issue is overruled.

 

Factual
Sufficiency

            When
considering claims that the evidence is factually insufficient, we must first
assume that the evidence is legally sufficient under the Jackson[10]
standard.  See Clewis v. State,
922 S.W.2d 126, 134 (Tex. Crim. App. 1996). 
We then consider all of the evidence weighed by the jury that tends to
prove the existence of the elemental fact in dispute and compare it to the
evidence that tends to disprove that fact. 
See Santellan v. State, 939 S.W.2d 155, 164 (Tex.
Crim. App. 1997).  Although we are
authorized to disagree with the jury’s determination, even if probative
evidence exists that supports the verdict, see Clewis, 922 S.W.2d
at 133, our evaluation should not substantially intrude upon the jury’s role as
the sole judge of the weight and credibility of witness testimony.  Santellan, 939 S.W.2d at
164.  Where there is conflicting
evidence, the jury’s verdict on such matters is generally regarded as
conclusive.  See Van Zandt v. State,
932 S.W.2d 88, 96 (Tex. App.– El Paso 1996, pet. ref’d).  Ultimately, we must ask whether a neutral
review of all the evidence, both for and against the finding, demonstrates that
the proof of guilt is so obviously weak as to undermine our confidence in the
jury's determination, or the proof of guilt, although adequate if taken alone,
is greatly outweighed by contrary proof. 
Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).[11]


            A
verdict will be set aside “only if the evidence supporting guilt is so
obviously weak, or the contrary evidence so overwhelmingly outweighs the
supporting evidence, as to render the conviction clearly wrong and manifestly
unjust.”  Ortiz v. State,
93 S.W.3d 79, 87 (Tex. Crim. App. 2002); see  Sims v. State, 99 S.W.3d 600,
601 (Tex. Crim. App. 2003).  A clearly
wrong and manifestly unjust verdict occurs where the jury's finding “shocks the
conscience” or “clearly demonstrates bias.” 
 Zuniga, 144 S.W.3d
at 481.  As the court of criminal appeals
explained in Zuniga, "There is only one question to
be answered in a factual-sufficiency review: 
Considering all of the evidence in a neutral light, was a jury rationally
justified in its finding of guilt beyond a reasonable doubt?”  See id. at 484.  

            Here,
the State had the burden to prove that Appellant, (1) with the intent to
inflict bodily injury on Thompson or abuse her sexually, (2) intentionally or
knowingly abducted Thompson (3) by restricting her movements without her
consent so as to interfere substantially with her liberty, by moving her from
one place to another or confining her with the intent to prevent her
liberation, or by secreting or holding her in a place where she was not likely
to be found.  See Tex. Pen. Code Ann. § 20.04(4) (Vernon
2003).  The brunt of Appellant’s argument
focuses on inconsistencies in the testimony offered by Bankston and Thompson.[12]  Specifically, Appellant emphasizes that  Bankston testified that (1) she would always
perform a sexual assault exam when a patient claimed to have been sexually
assaulted and (2) the small tears in Thompson’s vagina could be considered
consistent with consensual, yet vigorous, sexual intercourse.  Appellant further draws attention to various
inconsistencies in Thompson’s testimony, querying as follows:

 

Was there a knife,
keys, or nothing at all?  Did she walk to
Karenda and Tamekia or did she ride?  Was
she naked or [did she] have clothes on? 
Why did she not mention rape to the officer present at Karenda and
Tamekia’s house?  If [Appellant] raped
her, why was she continuing to communicate with him in jail?

 

Appellant concludes, quoting
Thompson, who stated, “I didn’t tell a lot that happened,” but contends that
Thompson’s being “scared” or “nervous” cannot excuse the contradictions in her
testimony and omissions in her initial statement to police.

            We
have reviewed the record in its entirety. 
We iterate that our evaluation should not substantially intrude upon the
jury’s role as the sole judge of the weight and credibility of witness
testimony, see Santellan, 939 S.W.2d at 164, and where
there is conflicting evidence, the jury’s verdict on such matters is generally
regarded as conclusive.  See Van
Zandt, 932 S.W.2d at 96.         We
conclude that the jury was entitled to find credibility in the testimony
offered by Bankston and Thompson.  Our
review of the record as a whole, with consideration given to all of the
evidence, both for and against the jury’s finding, has not revealed to us any
evidence that causes us to conclude that the proof of guilt is so obviously
weak or is otherwise so greatly outweighed by contrary proof as to render
Appellant’s conviction clearly wrong or manifestly unjust.  Therefore, we hold that the evidence is
factually sufficient to support the jury’s verdict.  Appellant’s third issue is overruled.

Disposition

            Having
overruled Appellant’s first, second, and third issues, we affirm
the trial court’s judgment.

 

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

 

 

Opinion
delivered July 31, 2006.

Panel consisted of Worthen,
C.J. and Griffith, J.

 

 

(DO NOT PUBLISH)











[1]
Willis indicated in her testimony that Appellant told her to retrieve Thompson’s
car keys from inside the house, which Willis did.





[2] Thompson later specifically states in her
testimony that she did not go with Appellant voluntarily.





[3]
The record reflects that the trailer owned by Appellant was located next door
to the residence occupied by his relatives.





[4]
Rhodes testified that the children would be outside playing during the hour
that Appellant and Thompson were visiting.





[5]
The record reflects that Thompson was employed at Sonic at the time in
question.





[6]
Appellant did not raise such an argument to the trial court.  See Tex.
R. App. P. 33.1(a).





[7] Having reviewed the record in the interest of
justice, we have found neither evidence nor an instance where Appellant sought
to introduce evidence that tends to support that (1) African Americans are a “distinctive”
group in Rains County, Texas, (2) that the representation of venires from which
juries are selected is not fair and reasonable in relation to the number of
such persons in the Rains County, Texas, or (3) that this underrepresentation
is due to systematic exclusion of the African Americans in the jury selection
process.  See Pondexter,
942 S.W.2d at 580.





[8]
See Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 41
L. Ed. 528 (1896).





[9] Appellant’s
reference to the “reasons given by trial counsel” is not proper argument.  See Tex.
R. App. P. 38.1(h).  Even if we
were to consider an argument by proxy such as this on appeal, Appellant’s trial
counsel’s objections do not meet the Rule 38.1(h) requirement that argument be
supported by appropriate citations to 

Footnote continued.

authorities.  Id.





[10]
See, e.g., Jackson v. Virginia, 443 U.S. 307, 315–16, 99 S. Ct.
2781, 2786–87, 61 L. Ed. 2d 560 (1979).





[11]
However, “contrary evidence does not have to outweigh evidence of guilt; it has
to be only enough to provide reasonable doubt.” 
Zuniga v. State, 144 S.W.3d 477, 483 (Tex. Crim. App.
2004). 





[12]
Appellant’s factual sufficiency argument centers upon the theory that Thompson
consented to having intercourse with Appellant. 
It does not address the potential bodily injury element alternatively
charged in this matter.  See Tex. Pen. Code Ann. § 20.04(4).